MONTGOMERY WARD & CO., INC., v. WINDHAM.

(In Banc. Feb. 14, 1944. Suggestion of Error Overruled March 13, 1944.)

[16 So. (2d) 622. No. 35482.]

(In Banc. March 13, 1944.)

[17 So. (2d) 208. No. 35482.]

R. H. & J. H. Thompson, of Jackson, and L. E. Oliphant, Jr., of Chicago, Ill., for appellant.

Barnett, Barnett, Jones & Stone, of Jackson, for appellee.

Argued orally by **Harvey Thompson**, for appellant, and by **Ross R. Barnett**, for appellee.

**Roberds, J.,** delivered the opinion of the court.

This appeal is from a jury verdict and judgment for four thousand dollars against appellant in favor of appellee for personal injuries claimed by appellee to have been suffered by her as a result of a fall in the store building of appellant located in Jackson, Mississippi, which fall was caused by the negligence of appellant. Appellee will be called plaintiff, and appellant defendant, in this opinion.

Defendant, on this appeal, urges among other contentions, that the lower court erred in not granting its request for a peremptory instruction, but, if not, that the verdict is so contrary to the great weight and preponderance of the evidence on the question of liability of defendant that the case should be remanded for trial before another jury. These contentions require a summary of the testimony.

Plaintiff introduced three witnesses—herself, her daughter and a Dr. Pettus.

She testified that as she and her daughter, Mrs. Mathiston, about 7:30 o'clock on Saturday night, June 27, 1942, were proceeding to leave said store building, and while walking along the center, or principal, aisle leading to the front, or street, door on the main floor, and when about the middle thereof, she stepped into a pool, or spot, of oil on the floor, slipped, fell to her knee and then to the floor upon her right hip, causing injury to her foot and hip; that the spot was slippery and looked like it was oily and had white "stuff" on it and there was a streak through it caused by her slipping. She said, "The place was about as long and I guess about that—it was just a place right there in the floor . . . it looked to be that depth . . . about one-eighth . . . A place, I guess, probably larger than a hat—a round place

. . . I guess it was about this—about a foot and a half . . . a form of powdered stuff, and it was on my hose; it tore my hose and was in my hose . . . ," and that one could see streaks through it where "other people had almost slipped at the same place—."

As bearing upon the liability of defendant she said, "I had stepped to one side, you know, when I fell the negro had some kind of broom—I don't know, just a broom, or mop, or something, he went over the floor, he had to move to one side to let me by when I fell, and when I went on up this way from where the negro had went over the place, or mopped on it, and he was down here, and there was a white streak where I slipped . . . ;" that after she fell her daughter assisted her into a chair; that immediately after her fall a Mrs. Everett and Mrs. Nickens, employees of defendant working nearby, came up to assist her; that one of them called Mr. Lambert, the manager, who came to the scene, and she called his attention to the spot on the floor, and Lambert ". . . rubbed his foot over it where I had fallen, and it showed streaks where he had rubbed his foot;" that her shoes were not old, and the heels thereof were not worn or turned; that after some twenty to thirty minutes Mrs. Nickens carried her home in Mrs. Nickens' automobile; that on Monday morning thereafter she, at the request of defendant, went to the Jackson Infirmary for examination and X-Ray of her injuries; that X-Ray pictures were made and she consulted Dr. Gordin; that he said, "I was awfully swollen," but gave her no medicine or treatment and told her to go to bed, which she did; that twice thereafter, at intervals of some two weeks, she went back to Dr. Gordin, but he gave her no medicine or treatments; that later, some time in July, she went to Dr. Pettus. She then described her injuries and the pain, inconvenience and expense resulting therefrom.

Mrs. Mathiston gave, in substance, the same cause and nature of the accident, except she said Mrs. Windham, ". . . fell against the counter and bruised her foot

and bruised her back . . . she didn't fall all the way down;" that Mrs. Windham weighed about two hundred pounds, and that the substance on the floor, "Looked like it was some kind of oil . . . it was right in the middle of the floor, almost as round as a hat, and it looked like it had just been put down; it was still wet."

Dr. Pettus described himself as a "Naturopath", and when asked, "What is that?" said "Deal with the natural healing arts;" that he examined Mrs. Windham sometime in July, and found "The pain was mostly in the triangle muscle there and the coccygeal . . . starting at approximately the end of the dorsal vertebrae, going down;" that Mrs. Windham returned later and he found an abscess on her instep.

Plaintiff here rested and defendant made a motion to exclude, which was overruled.

Defendant introduced eight witnesses, five of whom were its employees at the time of the accident, but only two of whom were so employed at the time of the trial.

Mr. Cook, the assistant manager, but not an employee when he testified, was on that floor, a short distance away, and Mrs. Nickens called him when Mrs. Windham fell, and when he got there she was sitting in a chair. He suggested a doctor and Mrs. Windham said it was not necessary; that she was feeling "all right"; that he examined the floor where she fell, and there was no foreign substance on it whatever, and he called attention of those present, including plaintiff, to that fact; that there were no streaks on the floor; that the place was about twenty feet from the main front door of the store, and in the center aisle leading to and from that door; that there were many people in the store at the time, and that from one hundred to two hundred people were passing along that aisle every fifteen minutes at that time; that those present examined the heels of Mrs. Windham's shoes, and the heels were badly worn; that the shoes were old; that when this was called to her attention, with the suggestion that this might have caused her to fall, she said "—

possibly that was true;" that Mr. Lambert, the manager, was never present at the scene; that he asked Mrs. Nickens to carry plaintiff home, which she did in her automobile. He said there was no janitor on the floor at the time; that the janitor was never allowed to work on the floors during business hours, nor until the store had closed and was free of customers, and that the store did not close until nine o'clock on Saturday nights; that the preparation used for cleaning the floors of this store was known as microsheen, and that it contained no oil or grease whatever; that it was several times as expensive as oil or grease floor applications, and that instead of rendering the floor slick it had the effect of preventing the floors from being slick; that a great many large establishments were using it for that very reason; that in any event it had been about thirty days since any application had been made to the floors of this store.

Mrs. Nickens, not an employee of the store when she testified, was a sales-lady in the store when the accident happened, and was "just a little piece" away and saw Mrs. Windham fall; said plaintiff "turned her ankle over and fell," and she assisted her up; that plaintiff only fell to her knees, and that no other part of her body came in contact with the floor; that the spot was examined and there was no foreign substance on it and it was not slippery; that she pushed her foot over the spot, and called attention to the fact it was not slippery; that plaintiff's shoes were old and the heels were worn off on one side and turned, and that plaintiff then admitted this might have caused her to fall; that she drove the plaintiff and Mrs. Mathiston home in her car, and plaintiff did not appear to be in any pain, but was laughing over the accident and said she was all right.

Mrs. Erwin, employed as head of a department by defendant, was nearby and saw plaintiff fall. She substantiated the evidence of Mr. Cook and Mrs. Nickens as to what transpired and the facts at the scene of the accident.

She also said there was no janitor on the floor at that time.

Mrs. Everett, secretary to the manager, said it was a part of her duties to make reports of accidents, and she was called and immediately came to the scene; offered to arrange for a doctor, and plaintiff said she did not need one, and would let her know if she did need one. Witness examined the floor and there was nothing on it, and plaintiff's attention was called to that fact; that plaintiff was shown the turned and worn heels of her shoes; that there was never any sweeping or mopping of the floors while customers were in the store, and not until after it had closed; that there was no janitor on the floor at that time; that Mr. Lambert, the manager, called plaintiff over the telephone Monday after the accident, and asked that she go to the Jackson Infirmary for examination and treatment if she needed treatment.

Nichols, the janitor, in the armed forces when he testified, said he never worked on the floors until after the store closed; that he was not on the floor when this accident happened; that the last time he had placed any cleaning substance on the floor was on June 2nd, before the accident on June 27th; that he cleaned the floors with microsheen, and did that only at such times as directed by the management, and he had not been so directed since June 2nd; that he usually applied this cleaning substance in periods of about thirty days.

Mr. Dalton, representative of the manufacturer of microsheen, testified that microsheen has two ingredients —one a solvent, which dissolves and removes dirt, oil, grease and other foreign substances from floors; the other is gum, which penetrates the pores of the wood, seals the floors, giving them the right color, and which leaves a non-slip surface; that it contains no oil or grease or wax whatsoever. He demonstrated its effect by using upon the courtroom floor, before the jury, a sample gotten from defendant, resulting, according to the record, in the floor being dry and clean and nonslippery. He placed a clean

handkerchief on the place where he had used it and stepped upon the handkerchief and it showed no oil or dirt or stain. He said a great many of the larger business houses over the country were using microsheen, although the price was several times greater than oily, greasy or wax preparations, because its use left the floors non-slippery and non-oily, thereby greatly lessening the danger of accidents, and resulting also in considerable savings to the merchants, in that articles of merchandise dropped upon the floor were not soiled, as was the case where they were dropped upon floors treated with oily or greasy or wax substances.

Miss Nance, an X-Ray technician of sixteen years' experience, employed at the Jackson Infirmary, made the X-Ray pictures of plaintiff, and testified that they were correct.

Dr. Adkins, connected with the Jackson Infirmary, who had interpreted X-Ray pictures for twenty-five years, and whose qualifications were admitted by plaintiff, testified that the X-Ray pictures of the elbow joints, pelvis area and hip joints of plaintiff showed no injury to the bones, but said the pictures would not show torn ligaments or sprained muscles—injury to the fleshy part of the body.

We have thus detailed, perhaps at tiresome length, the testimony in an effort to set forth a correct picture.

Defendant says its request for a peremptory instruction should have been granted because the burden was upon plaintiff to show, not only that the substance was in fact upon the floor, and its being there under the circumstances constituted negligence, but (if not so placed by a servant of defendant) that defendant either had actual knowledge of its existence, or, if not, that it had been there a sufficient length of time to charge defendant with constructive knowledge thereof, or that it was actually so placed by a servant of defendant acting within the scope of his duties, and that the proof entirely fails to show either fact.

On the first question—the time of its existence—defendant is correct, because the proof not only fails to show the time, but Mrs. Mathiston testified that it looked fresh and was wet.

The second contention—master and servant relation—presents a very doubtful question, but a majority of the judges are of the opinion that admitting as true, as must be done on this motion, all of the testimony bearing upon this fact, with the natural inferences to be drawn therefrom under the circumstances, that it establishes the relation of master and servant, and that this servant deposited the substance on the floor. However, it is manifest that the great weight and preponderance of the evidence on the cause of this accident and the liability therefor are on the side of the defendant—so much so that it is our duty, in the interest of justice, to reverse and remand the case so that another jury may pass upon these questions, and for that purpose the case is reversed and demanded.

We find no reversible error in the other assignments. Reversed and remanded.

**Smith, C. J.**, agrees with the trial judge that the record simply presents a question of fact for the determination of the jury and not of the court, and that the judgment of the court below should therefore be affirmed.

On Suggestion of Error.

**Roberds, J.**, delivered the opinion of the court on suggestion of error.

The original opinion in this case, 16 So. (2d) 622, 625, contains this expression, ". . . it is manifest that the great weight and preponderance of the evidence on the cause of this accident and the liability therefor are on the side of defendant—so much so that it is our duty, in the interest of justice, to reverse and remand the case so

that another jury may pass upon these questions . . ."
It is suggested that by these words we have prescribed a different requirement defining the conditions under which this court must reverse jury verdicts as being against the weight of the evidence from that heretofore announced by this court, and one which is more burdensome to the victor in that verdict.

In Faulkner v. Middleton, 186 Miss. 355, 188 So. 565, 190 So. 910, we said:

"The Court has never attempted to prescribe any elaborate formula, adequate to meet all cases, as to when a verdict will be considered against or contrary to the great or overwhelming weight of the evidence. Obviously it would be as nearly impossible to do so as to attempt to define a reasonable doubt—not to mention other familiar phrases in daily use in the law. The expressions on the point have usually been as, for instance, in Teche Lines, Inc., v. Bounds, 182 Miss. 638, 652, 179 So. 747, 751, that a verdict will be set aside 'when, but only when, clearly or manifestly against all reasonable probability;' or as said in Beard v. Williams, 172 Miss. 880, 884, 161 So. 750, 751, when the Court is 'convinced, from the evidence, that the jury has been partial or prejudicial, or has not responded to reason upon the evidence produced.' Mindful that it is a duty not of choice but one imposed by the constitution itself, the trial judge, and upon review the appellate court, must apply to the evidence, all parts of it considered together, a calm, deliberate and impersonal judgment founded in the lessons of long experience and observation in the lives of men in all their various ranks, and measure thence according to sound human standards of reasonable probabilities.

"But in measuring the probabilities, the character and cogency of the evidence, its reasonableness, its harmony or inharmony with the undisputed facts, or with the facts of common knowledge, or with the laws of nature, the character and intelligence of the witnesses, their several attitudes, and the like—not the number of witnesses

for the respective sides—must be among the tests. The problem is not to be reduced to any such a simple process as counting the witnesses, although this in some cases, as for instance in Mobile & O. Railroad Co. v. Bennett, 127 Miss. 413, 90 So. 113, may have some bearing. At last, the question is: Can the Court say with confidence that the verdict is manifestly against all reasonable probability; that manifestly it has not responded to reason upon the evidence produced? Unless the Court can so say, the verdict must stand, for otherwise there would be only a matter of conflict in the evidence, in which case, if the issues have been fairly submitted to the jury on proper instructions, the verdict is irreversible.''

Other expressions have been used in the history of this court—such as against the great preponderance, against the weight, contrary to overwhelming weight, of the evidence. See Miss. Digest, Vol. 2, under Appeal and Error, key number 1003, and pocket supplement thereto. In the recent case of Gerard v. Gill, 195 Miss. 726, 15 So. (2d) 478, 480, dealing with the finding by the chancellor, we said: ''This Court has used different expressions to describe the conditions under which it is its duty to reverse the chancellor on his finding of fact—such as that the finding is manifest error, clearly erroneous, plainly or manifestly wrong, against the great preponderance, or overwhelming weight, of the evidence.''

Each case must depend upon its own peculiar circumstances. There never has been and, it is safe to say, never will be two exactly alike. No combination of facts has ever recurred in exactly the same order and sequence and relation to each other. When the quoted provision from the original opinion is considered as an entirety and as applied to the evidence in this case we do not think it has incorrectly defined the test in this case.

But, aside from whether the words used define the rule with precise exactitude, the reversal is based upon the comparative weight and effect of the evidence on behalf of appellant and appellee, and the opinion summarizes

that evidence. The comparison speaks for itself. We did not need to define the rule. We refrained from analyzing the evidence and setting forth the several reasons which prompted our conclusion because the case is to be retried, and we thought that should not be done.

It is now appropriate, as expressing our general attitude on this question, to quote from Universal Truck Loading Co. v. Taylor, 174 Miss. 353, 164 So. 3, 4, where this court said: "It is with great reluctance, as we have often said, that we will reverse a verdict of a jury on the facts. At the same time the obligatory duty of the courts in that respect is as expressed in two recent opinions by Judge Ethridge, as follows: 'We are conscious of the fact that the verdict of a jury is to be given great weight, and is the best means, when fair, of settling disputed questions of fact. Nevertheless, throughout the entire history of jury trials, the courts have exercised a supervisory power over them, and have granted new trials whenever convinced, from the evidence, that the jury has been partial or prejudiced, or has not responded to reason upon the evidence produced. The duty of the court in supervising trials by jury is such a vital part thereof that no court may refuse to exercise such power whenever fully convinced of its duty so to do.' "

In the original opinion is this statement, "The second contention—master and servant relation—presents a very doubtful question, but a majority of the judges are of the opinion that admitting as true, as must be done on this motion, all of the testimony bearing upon this fact, with the natural inferences to be drawn therefrom under the circumstances, that it establishes the relation of master and servant, and that this servant deposited the substance on the floor." Appellant says that we thereby admitted the existence of the suggested facts. We were discussing, and the language is directed to, whether there was sufficient evidence for the case to go to the jury on these questions. We might have used more apt language, but we think it is clear, considering the questions under

decision and the entire opinion, that we were not adjudicating that, on the whole record, these facts had been proved, but merely that there was enough evidence bearing upon them to withstand a motion for a peremptory instruction. What we said as to the weight of the evidence applies to these facts as well as to the other facts essential to establish appellant's right to recovery in this case.

Suggestion of error overruled.