234 So.2d 312 (1970)
Tommy R. ELSWORTH, Sr. and Tommy R. Elsworth, Jr., a Minor by Tommy R. Elsworth Sr., Father and Next Friend
v.
C.E. GLINDMEYER, E.E. Patenotte, Jr. and Atlas Cuevas.
No. 45676.
Supreme Court of Mississippi.
April 13, 1970.
Rehearing Denied May 11, 1970.
Daniel, Coker, Horton & Dukes, Gulfport, for appellants.
Holleman & Necaise, Gulfport, for appellees.
*313 BRADY, Justice:
This is an appeal from a judgment of the Circuit Court of the First Judicial District of Harrison County, Mississippi, wherein the appellant was denied damages arising out of a collision between an automobile, operated by the wife of the appellant, and a large Ford 5,000 all-purpose tractor owned by the appellees C.E. Glindmeyer and E.E. Patenotte, Jr. and operated by appellee Atlas Cuevas, their agent and employee. From a verdict in favor of the appellees, this appeal is taken.
Numerous errors are assigned by the appellant but the disposition of this case requires our consideration of only three errors. We will consider the first two errors together, the first error being that the lower court erred in refusing an instruction which would have instructed the jury that the appellees were guilty of negligence as a matter of law, because the tractor was in the wrong lane at the time of the accident and the only testimony to the contrary was so inherently improbable and unbelievable when compared to the known facts as *314 to amount to no evidence at all. The second error urged is that the verdict and judgment entered thereon are contrary to the overwhelming weight of the evidence. In resolving these assignments of error it is essential that the cardinal established facts in this cause be reviewed.
On the morning of December 19, 1968, Mrs. Shirley Elsworth, twenty-one years old, the wife and mother, respectively, of appellants, was driving their 1968 Pontiac automobile, approximately sixteen feet in length, over highway number 603, a county paved road also known as the DeLisle-Vidalia Road. The road extends generally in a north and south direction. Mrs. Elsworth was proceeding north, in the east lane, that being the proper lane for anyone traveling north. The road is practically straight for a distance of 1187 feet from a slight curve on the south end to a cattle-guard entrance located off the east side leading to the home of Mr. Clyde Malley.
Appellee Atlas Cuevas, admitted agent and employee of appellees Glindmeyer and Patenotte, was driving their Ford 5,000 power-steered tractor weighing 6,250 pounds and loaded with a hydraulic lifted four-bladed turning plow weighing 1,289 pounds, so that the overall weight was 7,539 pounds. Mr. Cuevas had been plowing, but had to get smaller plows to perform this job and was returning over the same road traveling south thereon.
As he passed in front of Mr. Clyde Malley's home he was proceeding in the west half and southbound lane of the road. This is confirmed by Mr. Clyde Malley and they both waived to each other as Cuevas proceeded southward. Thereafter Mr. Clyde Malley never saw where the tractor was until after the wreck. He looked southward as he and a friend, Harbert Malley, were talking and saw the Pontiac car "coming up the road sideways the front end headed west and the back end was headed east, I just put my hands over my eyes and said: `Look yonder.'" He did not know what lane the tractor was in at the time of collision and repeatedly refused to say where it was. He ran to the scene and saw the car impaled on the front of the tractor. Both vehicles were in the east half and northbound lane. Mrs. Shirley Elsworth was dead in the Pontiac. Cuevas was in the road. Subsequently, on Thursday, March 20, 1969, before the trial on March 27, 1969, he stepped the distance that the Pontiac had traveled from the place where he thought he first saw the car going sideways to the spot where the oil was deposited in the east half and northbound lane of the road and found it to be sixty-five steps. The left rear wheel of the tractor, he testified, was closer to the east edge of the road and the front of the tractor was nearer the middle of the road. He realized when he saw the Pontiac moving sideways that a crash was inevitable. He saw the tractor driven into the center of the Pontiac's right side. He testified that the oil, dirt and debris from the vehicles were in the east and northbound lane of traffic under the vehicles, except for a little glass which was over in the west side. Mr. Malley stated that he did not see any skid marks at the scene of the collision.
Mr. Atlas Cuevas testified that he was driving on the west or southbound side of the road traveling about ten miles per hour. He testified that he stayed on the west or right side of the road as he proceeded south because he always drove on the right side of the road. Cuevas first stated that he first saw the car when it came around the curve, which the map reflects would be a distance of eight hundred feet from the point of collision. The vision south and north is unobstructed considerably farther. Cuevas stated that the Pontiac was traveling so fast there was nothing he could do. He subsequently said the car was only two hundred feet away, but on examination by his attorney he increased the distance to three hundred feet. He said the car was traveling so fast at the time it came around the curve, "it just did that," indicating a side waving hand motion, "and *315 that is all I remember." He was able to determine and remember, however, that the car was traveling eighty to ninety miles an hour and that the time interval between the time he first saw the car and the collision was just a "snap of the finger." Repeatedly he stated that from the time he first saw the car he had no further memory. Cuevas stated he did not know where the tractor was after the accident. He did not know if the tractor ever left the southbound lane or what side of the highway the car was on after the accident. He testified he was knocked out and the skull of his head "was cracked." He failed to give any details as to why and how the collision actually occurred except as above outlined.
Mr. E.E. Patenotte, an employer and appellee, arrived a short time after the accident. He had been following Mr. Cuevas. He testified he was so excited that he did not notice the details of the wreck, but was more interested in getting Mr. Cuevas to the hospital. Mrs. Elsworth appeared to be dead. Even Patenotte admitted, however, that the tractor "was a little on the left, off-center" of the road coming south, "and the car was cross-ways." It is interesting to note that Mr. Patenotte testified that the tractor dealer advised him the tractor "had a maximum speed of around seventy miles an hour, something like that."
County Patrolman Claude Miller, with fourteen or fifteen years of service, arrived at the scene approximately twenty minutes after he received the call over his radio. He testified that the tractor was in the northbound half of the road. Its rear left wheel was four or five inches closer to the edge of the pavement than the front end. "The tractor  the front of the tractor went in the right door of the car * * *. The tractor's front end was about halfway through the front door of the car on the right side." He testified "the car was on the east or north bound lane * * *. It was turned, the back end of the car was on the right, going north, it would have been in the right edge of the road." He testified that the tractor was facing south in the northbound lane. The road, he stated, was approximately twenty feet wide, the Pontiac was approximately sixteen feet long. The back bumper of the car was "almost right at the edge of the road." (The east side.)
Patrolman Miller stated, "the oil and debris and dirt from the plow were all underneath the plow and tractor and the car." He was asked, "Was there any debris in any other area nearby?" He replied, "I didn't see any, no sir." On cross examination by appellee's attorney he was asked, "Now there was debris all over that road, wasn't there Claude?" He replied, "No sir there wasn't." Also, he was asked, "Mr. Miller, you say there were no skid marks (at the scene of the accident)?" He answered, "There were no skid marks."
Patrolman Miller took photographs which graphically depicted the scene immediately after the wreck. The pictures showed the position of the vehicles in the northbound lane of traffic, the front of the tractor protruding halfway through the automobile at the center of its right side. The front wheels of the tractor were broken off and the tractor front was resting on the chassis of the Pontiac. The rear of the Pontiac was about the east edge of the pavement and the front end was extending into the west half of the road. These pictures showed the exact position of the vehicles, the oil deposit, edges of the road and the condition of the tractor and car.
Patrolman Miller testified that appellees Glindmeyer and Patenotte "came by and looked at the pictures the night after the accident happened and said they would like to get copies of them." The record discloses that no further effort was ever made by the appellees or any of their attorneys to get the photographs from Miller. Patrolman Miller testified that traffic could and did pass on the west side of the road, by putting one wheel on the shoulder, *316 and the record reveals that "even a gravel truck came by there at that time."
Mr. John C. Hogan, who repairs heavy equipment and operates a wrecker service, was called and went to the scene of the wreck. He did nothing until Officer Miller had made his investigation of the premises and taken pictures. He corroborated Officer Miller completely as to the vehicles being in the east and northbound lane, and the positions therein, the tractor headed south in the northbound lane and the car sideways in the northbound lane. He testified that "the car was tied to the tractor and cross, the car was in the northbound lane, it was traveling north, but turned almost completely sideways where the tractor drove into it." This disinterested witness testified that there were no skid marks. Regarding the debris in the road Mr. Hogan testified, "Well, the usual amount of things you find in that, mud and the tractor had spilled oil on the road, around the tractor and in the car." When asked, "Where was this debris located?" he replied, "It was in the neighborhood, close to the car and the tractor. It seemed to me that the large part of it probably under the tractor." He further stated, "This tractor was tied into the automobile; the tractor had hit the car in such a way, the upper part of the tractor  the radiator and that part  had gone over the frame of the car, shoved the body back a little bit and had went into the body of the car, that's for sure, along in the center section * * practically in the center of the car." He further testified that "after he had pulled it out from under the tractor" he saw that "the wheels of the car were locked." He "drug it about one hundred feet." He then returned and "picked up the front end of the tractor and dragged it off in the same manner, off the side of the road. It was also locked, the back wheels on it were locked." Though there were no skid marks around the vehicles prior to their being moved, this witness testified that when they were moved both made skid marks.
"Q. Do I understand that in the course of your separating these two vehicles, you did cause skid marks to be made on the road?
"A. Both wheels were locked and they made skid marks as soon as they were moved, on both machines. The back wheels on both machines."

He testified further that "if there had been a center line in the road, but there was no center line  the front of the car would have been a little west of the center line." This witness stated that the photographs depict the scene exactly as it was. The four headlights of the car were intact and only the right front hub-cap was off of the automobile lying four or five feet from it.
We address ourselves to the first two errors assigned by the appellants, that the verdict of the jury is against the overwhelming weight of the evidence, and the appellants should have been given an instruction instructing the jury that the appellees were guilty of negligence as a matter of law because the tractor was in the wrong lane at the time of the accident and the only testimony to the contrary was so inherently improbable and unbelievable when compared to the known facts as to amount to no evidence at all. The appellees contend in their excellent brief that the relative positions of the vehicles after the collision constitute no proof of the point of impact. Appellees urge that the only eye witness to the collision was Clyde Malley who could not say which side of the road the tractor was on and could only say the plaintiff's automobile was coming down the road sideways out of control. Appellees point out that Cuevas testified that he was on the west and southbound lane of traffic at the time of the collision, which fact the appellants urge is disputed by the physical facts, but appellees urge that the jury resolved this disputed fact in favor of the appellees. Counsel for the appellees categorically assert that "there is absolutely no proof in the record that *317 the tractor was on the wrong side of the road before the collision, immediately before the collision or at the time of the collision, and state once again that the position of the tractor after the collision does not constitute proof of the position of the tractor before the collision." We cannot agree with these conclusions of the appellees.
First, because Cuevas testified that he was driving the tractor in the right or southbound lane when he waved to Clyde Malley does not thereby establish the fact that he continued in the west or southbound lane a distance of three hundred eighty-seven feet until the collision. Appellees concede that Clyde Malley did not know in what lane the tractor was at the time of the collision. It is evident that the only testimony as to the tractor being in the west or southbound lane before or at the time of the collision is that of appellee Cuevas. While Mrs. Elsworth's lips are sealed in death, there are numerous and uncontradicted physical facts which strongly negative and refute the assertion of Cuevas that the Tractor was in the west and southbound lane at the time the vehicles collided. It is undisputed that the tractor struck the Pontiac on the right side, penetrating about half-way through the automobile and resting on the chassis or frame. It is undisputed that the two vehicles were "tied together" or "fastened together." The automobile had to be pulled out from under the tractor. The wheels of the automobile were locked and the car had to be dragged off the east and northbound lane of the road to the south. It is undisputed that the wheels of the tractor were also locked and it had to be dragged also out of the east and northbound lane of the road. Both vehicles laid down skid marks when being dragged out of the east and northbound lane where all witnesses who saw the wreck testified the vehicles were situated immediately after the collision. These witnesses were Clyde Malley, Patrolman Claude Miller, the wrecker operator John C. Hogan, and appellee E.E. Patenotte, Jr. It is undisputed that there were no skid marks visible at the scene of the collision as testified to by Patrolman Miller and wrecker operator Hogan. It is also undisputed that the mud from the plows, the tractor and car, the oil from the tractor, and the debris, were all in the east or northbound lane of the road under the tractor and automobile. There was no debris in the west or southbound lane save for a little glass. The large oil spot was under the tractor and was later covered with sand. All of the foregoing facts are conclusively shown by the photographs in this cause.
Although excluded by the trial court, the appellants, seeking to refute the implication created by the appellees' examination of witness Hogan that the position of the vehicles was the result of "a high speed wreck," with "tremendous force and impact," offered in rebuttal the testimony of Mr. Hogan as to what the two vehicles revealed when he examined them, namely, "As I say, we have handled hundreds of them, and that impact evidently had been two things struck together; the car didn't knock the tractor, the tractor didn't knock the car they tied together in * * *" (Objection). This statement is borne out by the fact that there were no skid marks made by the vehicles prior to, at the time of, or subsequent to the collision; that all of the mud, oil and debris was under the two vehicles whose rear wheels were locked, and would not rotate, that the tractor had pierced the right side of the car penetrating about halfway through and was fastened onto the chassis or frame of the automobile. The court was not requested to instruct the jury to disregard this statement.
After a meticulous study of the record and the exceptional briefs of counsel, it is the opinion of this Court, based upon the uncontroverted physical facts and testimony in the record, that the verdict of the jury is against the overwhelming weight of the evidence for the reasons which were stated in Teche Lines, Inc. v. *318 Bounds, 182 Miss. 638, 649, 179 So. 747, 749 (1938), in which Justice Virgil A. Griffith, speaking for the Court, stated as follows:
If there be any one thing in the administration of law upon which the decisions, the texts, and the general opinion of bench and bar are in agreement, it is that evidence which is inherently unbelievable or incredible is in effect no evidence and is not sufficient to sustain a verdict. This is true even in those jurisdictions which still cling to the scintilla of evidence rule. And, except in the few jurisdictions wherein the latter rule prevails, the overwhelming weight of authority throughout the country is that believable or credible evidence in civil cases is that which is reconcilable with the probabilities of the case and that bare possibilities are not sufficient. Where evidence is so contrary to the probabilities when weighed in the light of common knowledge, common experience, and common sense that impartial, reasonable minds cannot accept it other than as clearly an improbability, it will not support a verdict.
"It has been commonly said: Verdicts must rest on probabilities, not on bare possibilities. There is not capacity in any number of the former to create the latter. So the person on whom the burden of proof rests to establish the right of a controversy, must produce credible evidence from which men of unbiased minds can reasonably decide in his favor." Samulski v. Menasha Paper Co., 147 Wis. 285, 133 N.W. 142, 145. "An inherently incredible story is not made credible by being sworn to. Nor can it be allowed to serve as the foundation of a verdict." McCarthy v. Bangor, etc., Co., 112 Me. 1, 90 A. 490, 492, L.R.A. 1915B, 140, 142. "Courts are not required to believe that which is contrary to human experience and the laws of nature, or which they judicially know to be incredible, * * * although there may be evidence tending to support it." Lessig v. Reading, etc., Co., 270 Pa. 299, 304, 113 A. 381, 382, quoting from Norfolk & W.R. Co. v. Strickler, 118 Va. 153, 86 S.E. 824. "The jury will not be warranted in finding the existence of a fact on the positive testimony of a witness, which is contrary to conceded facts or matters of common knowledge, or all reasonable probabilities." Latta v. Fidelity etc. Co., 186 Wis. 116, 122, 202 N.W. 299, 302.
The above are a few quotations which could be supplemented by hundreds from nearly every common-law jurisdiction. Our own decisions, upon the precise point, are in accord therewith from the early history of this court down to our last expression in Yazoo & M.V. Railroad Co. v. Skaggs, [181 Miss. 150], 179 So. 274, 278, wherein we held: "As this court has frequently said, verdicts and judgments in civil actions must be based on the probabilities of the case, not on possibilities; and a verdict, although it is treated with great respect, has no force to convert a possibility into a probability." See, also, Yazoo & M.V. Railroad v. Lamensdorf, supra. Incredibility as measured in the scales of probability was acted upon in review as early as Wilson v. Horne, 37 Miss. 477. The Supreme Court of Missouri in Hook v. Ry. Co., 162 Mo. 569, 580, 63 S.W. 360, 362, has tersely stated the rule thus: "Though this court will not undertake to measure the probative force of the conflicting testimony of witnesses upon controverted issues of facts, but * * * must leave those matters * * * to the jury for determination, still [the court] is not so deaf to the voice of nature, or so blind to the law of physics, that every utterance of a witness in derogation of those laws will be treated as testimony of probative value for the consideration of the jury, simply because of its utterance."
It is not essential to a review that the improbability shall amount to an impossibility. This precise question was recently considered and decided in Interstate Fidelity Building & Loan Ass'n v. Hollis, 41 Ariz. 295, 17 P.2d 1101, 1102, wherein it was held that a verdict should be set aside if the testimony in support thereof is so *319 incredible as to be beyond the ordinary experience of mankind, and that the rule would be too narrow which would hold that a reversal may be had only where the improbability amounts to an impossibility. The best and most succinct statement which we have found is that of the court in Spiro v. St. Louis Transit Co., 102 Mo. App. 250, 262, 76 S.W. 684, 688, as follows: "Verdicts resting on evidence which looks contrary to the ordinary course of nature are not infrequently set aside and retrials directed, by appellate courts, as a proper precaution against an unjust outcome of litigation. While it is fundamental that juries must weigh evidence, and trial judges revise their findings, instances happen in which, from one cause or another, this practice so obviously failed to work out a right result that an imperative call is heard to supplement it by an exceptional procedure, in order that justice, the end of all procedure, may not be frustrated. This prerogative of courts of error is sparingly employed, but that it exists, as an emergency expedient, for the correction of verdicts palpably wrong, is certain. The appropriate use of it does not require a court to be convinced that the jury found an event to have occurred that was physically impossible or miraculous. It is enough if the event found was so improbable, according to ordinary operation of physical forces, or was so overwhelmingly disproved by credible witnesses, as to compel the conviction that the jury either failed to weigh the evidence carefully, or drew unwarranted inferences, or yielded to a partisan bias."
Upon a review of all the authorities, including, of course, our own cases, the rule must be declared by way of resume as follows: Verdicts are to be founded upon probabilities according to common knowledge, common experience, and common sense, and not upon possibilities; and a verdict cannot convert a possibility or any number of possibilities into a probability. But before an appellate court can say that what the jury has adjudged as if a probability is nevertheless only a possibility, it must be clear or manifest that only a possibility rather than a probability is shown by the evidence. Some of the cases say that a test is whether the alleged fact found by the jury is or is not extremely improbable or highly improbable. These terms are indefinite, and we prefer the terms which have so long been generally used in this jurisdiction in connection with the review of findings of fact, to wit, that they will be set aside when, but only when, manifestly or clearly wrong, which is to say, when, but only when, clearly or manifestly against all reasonable probability.
For the collision to have occurred in the west and southbound lane as the appellee Cuevas asserts, and for the two vehicles, the tractor with the driver weighing over seven thousand, six hundred pounds, and the car and its driver weighing between two and three thousand pounds, to have come to rest in the east and northbound lane with the car extending west and east and the tractor pointing south, fastened or tied into the car with its front enmeshed half-way through the right side of the automobile and resting on the car's chassis, forming a rigid "T" because of the union, with rear wheels locked, and not leave a particle of mud, dirt, or debris, or one drop of oil in the west or southbound lane, with no skid marks or tire tracks whatsoever in the west and southbound lane, is nothing short of a miracle. The ruptured crank case of the tractor and the locked wheels of the vehicles in some supernatural way had to be transported, as they were locked together, from the west or southbound lane and deposited in the east or northbound lane without leaving any debris, trace of oil, or tire marks whatsoever in the west and southbound lane, save for a few pieces of glass. The verdict of the jury, as is true in Teche Lines, Inc. v. Bounds, supra, is based on testimony which is inherently incredible and is contrary to human experience and the laws of nature. We stated in that case:
The incredible story is not made credible by being sworn to. * * * Verdicts are *320 to be founded upon probabilities according to common knowledge, common experience, and common sense, and not upon possibilities, and a verdict cannot convert a possibility or any number of possibilities into a probability.
We must hold that the verdict of the jury based upon the testimony of appellee Cuevas is clearly and manifestly against all reasonable probability and therefore the judgment must be reversed.
As reflected in Geigy Chemical Corporation v. Allen, 224 F.2d 110 (5 Cir.1955), Gunn v. Grice, 204 So.2d 177 (Miss. 1967), Western Geophysical Company of America v. Martin, 253 Miss. 14, 174 So.2d 706 (1965), Brewer v. Anderson, 227 Miss. 330, 86 So.2d 365 (1956), Montgomery Ward & Company v. Windham, 195 Miss. 848, 16 So.2d 622 (1944), suggestion of error overruled 195 Miss. 860, 17 So.2d 208 (1944). This Court has constantly held that under the Constitution it has the right to review the evidence and set aside the verdict of a jury on the ground that the verdict is against the overwhelming weight of the evidence, and in fact is under a duty to do so.
Furthermore, the use of the phrase "the absolute duty" which is argumentative as stated in appellees' instruction No. 6 has been condemned by this Court in Niles v. Sanders, 218 So.2d 428, 432 (Miss. 1969) in the following language:
While the giving of this instruction standing alone probably would not require reversal of the case, we think that the instruction in the form in which it was granted should not be given upon a retrial. Also, the word "duty" should not have been qualified by the word "absolute."
Appellees' instruction No. 6, among other items, advises the jury:
The Court further instructs the jury that under the laws of Mississippi it is the absolute duty of the plaintiffs in this case to prove by a preponderance of the evidence that the defendants were in fact guilty of some negligence that proximately caused or contributed to the accident * * *.
In the case at bar the phrase "absolute duty" is used to qualify the verb "prove" and goes directly to the degree of proof necessary for the appellants to recover. The instruction is misleading and erroneous and of itself justifies, under the facts of this case, a reversal.
Instruction No. 4 granted the appellees is as follows:
The Court instructs the jury for the defendants that you must return a verdict for the defendants unless the plaintiffs have proven to the satisfaction of a jury by a preponderance of the evidence that the aforenamed defendant, Atlas Cuevas, was negligent in the operation of his tractor immediately preceding the accident. (Emphasis added.)
The words, "immediately preceding," in instruction No. 4 following the mandatory requirement with the qualifying limitation are open to varying interpretations of what "immediately" means. The test applicable is whether the negligence prior to or at the time of the collision was a proximate or contributing cause of the accident. The element of time, while important, is not necessarily restricted to a narrow limitation as can be connoted by the word "immediately." Thus this instruction is also argumentative.
The appellants are entitled to a new trial on all issues since the verdict is contrary to the overwhelming weight of the evidence and which, combined with the erroneous instructions given on behalf of appellees, make it apparent that a fair trial was not afforded the appellants in this cause.
Citation is unnecessary because throughout the United States in all civil jurisdictions it is uniformly recognized that the jury is the trier of facts and properly resolves logical issues of fact in dispute. *321 Furthermore, this Court is, as all courts are, reluctant to disturb the verdict of a jury. This reluctance, however, presupposes that the verdict exemplifies a logical and reasonable determination of the issue as to what the true facts are. Nevertheless, a jury verdict is no magic talesman or philosophers' stone which can by its pronouncement per se change the base ore of impossibility into the royal metal of fact. A verdict does not by its utterance create that which cannot be determined rationally to have existed. A verdict cannot metamorphose an incredible assumption into a plausible fact worthy of being accepted as a reality. Teche Lines, Inc. v. Bounds, supra. When law is not amenable to common sense or reason, it ceases to be a guide for man's great institution of self-regulation and assuredly lies beyond the cable tow of justice. If justice is to endure, it will be in the fair and impartial adjudication of the rights of all concerned through the operation of law based upon facts grounded in common sense and reason. No court is required to believe, or should be bound by improbable, incredulous, or unreasonable evidence supporting a verdict, as in the case at bar, which is violative of physical laws, human experience and common sense, and which intrudes into the realm of the supernatural.
For the foregoing reasons the judgment is reversed and the cause is remanded.
Reversed and remanded.
ETHRIDGE, C.J., and RODGERS, PATTERSON and INZER, JJ., concur.
ROBERTSON, J., GILLESPIE, P.J., and JONES and SMITH, JJ., dissent.
JONES, J., GILLESPIE P.J., and SMITH and ROBERTSON, JJ., specially dissent.
ROBERTSON, Justice (dissenting).
I am unable to agree with the majority of my brethren that the jury verdict for the defendants is against the overwhelming weight of the evidence.
There were only two eyewitnesses to to this tragic accident, Atlas Cuevas, the tractor driver, and Clyde Malley, a homeowner whose property was located on the east side of the paved county road almost opposite the point of impact.
Cuevas was the first witness and was called as an adverse witness by the plaintiffs; Malley was called by the plaintiffs as their witness. Both witnesses testified that Cuevas was driving a large Ford tractor, with a four-way turning plow attached on the rear and suspended by the hydralic gear, south on the county highway. It is undisputed that he was driving about 10 miles an hour. Cuevas testified in response to questions by plaintiffs' counsel:
Q. Now, at the time you were waving at Clyde Malley, and just immediately before that, did you see any other traffic on the road?
A. No sir.
Q. Well you did see a Pontiac sometime in there, did you not?
A. Yes sir.
Q. Which side of the road were you on when you first saw the Pontiac?
A. I was on the right-hand side.
Q. Did you ever leave the right-hand side of the road?
A. No, sir. When I am driving I stay on the right-hand side all the time.
Q. You know that it would be very dangerous to get in the other fellow's lane, don't you?
A. Right.
Q. All right; now, I believe in your answer you contended or your attorneys contended that this car was coming in a northerly direction?
A. It was coming from down south, headed north.
*322 Q. In other words, it was coming like from the Jasper Ladner store, then past the Clyde Malley house and on to the north?
A. Yes, sir.
Q. Now, how far was this car from you when you saw it for the first time?
A. It came around the curve just like a streak, wide open, and I just seen it do that and that is all I remember.
Q. Well, now, before you tell us about that, how far was the car from you when you saw it do that?
A. Well, it was so fast that it was right on me.
Q. Well, was the car as much as 200 feet from you when you first saw it?
A. No, I saw it when it came around the curve, it came around so fast until I couldn't run in the ditch.
Q. You mean you didn't have time?
A. No, sir, I didn't have time to do nothing.
Q. Which side of the road was the Pontiac coming on?
A. Well  it just  made a rocking, like that (indicating).
BY MR. BOYCE HOLLEMAN:
Let the record show that the witness is moving his hand back and forth indicating the rock in the car.
(Witness so indicates by moving hand back and forth in rocking motion.)
MR. DANIELS, continuing:
Q. Mr. Cuevas, how far away was the car the first time you saw it, could you give us any idea?
A. Well, it was driving so fast, at the same time it came around the curve, it just did that (indicating) and that is all I remember.
Q. It is a very short distance from that curve to where you were?
A. Yes, sir.
Q. Would you estimate as much as 200 feet?
A. Something like that.
Q. Is that a fair estimate as to the distance to the curve?
A. Something like that.
Q. Well, you didn't have time to judge it's speed, I take it?
A. No, sir, it was coming so fast.
Q. But you couldn't judge its speed?
A. I would say it was making about 80 or 90 miles an hour.
Q. You mean in this brief time you judged that?
A. It happened so fast.

* * * * * *
Q. All right, sir, now you described and you used your hand 
A. The car just did that (making motion of rocking with his hands) and that is all I remember.
Q. That is all you remember?
A. Yes, sir.
Q. Well, how can you tell us how fast it was going if you don't remember?
A. Well, what I mean, I was knocked out when it hit me.
Q. And do you know which side of the road you were on and the tractor was on when you and the car came together?
A. I was on the right-hand side.
Q. You were on the right, or southbound, side of the highway?
A. Yes, sir.
*323 Q. Did your tractor ever leave the southbound side of the highway?
A. Well, that is what I don't know. I was knocked out.
Q. Do you know where the tractor was when 
A. I was badly crippled up myself. I stayed in the hospital I don't know how long. My hands were all smashed, my ribs, the skull of my head cracked, and 
BY THE COURT:
Just answer in response to the question, now.
MR. DANIELS:
Q. Did you know where the tractor was when the accident was over and the vehicles came to rest?
A. No, sir. I don't.
Clyde Malley, the only other eyewitness, testified on direct examination by plaintiffs' counsel:
Q. Let me ask you this, with reference to your house and the road where was the tractor when it first got your attention?
A. It was headed south on the west side of the road.
Q. On the west side of the road?
Q. Which lane of traffic would that be in? North or south?
A. It would be 
Q. North or south-bound lane? Which way was he going?
A. He was going South.
Q. In his own lane, was he in his own lane?
A. Yes, sir.
Q. Going south, that would be in the right-hand side?
A. Yes.
Q. And was he north or south of your house at the time you first saw him?
A. I would say he was just a little south of my house.

* * * * * *
A. Well, I happened to look down the road and I seen this car coming up the road, sideways, the front end was headed west and the back end was headed east. I just put my hands over my eyes and said: "Look yonder."
Q. Did you see the car and the tractor collide?
A. No, sir, I didn't.
On cross-examination by defendants' counsel Malley testified:
Q. Now, when you saw that car coming sideways you knew immediately that it was out of control, didn't you?
A. Yes, sir. I sure did.

* * * * * *
Q. There was nothing that attracted your attention to Atlas Cuevas on that tractor, that it was being operated in any unusual manner whatsoever, was there, Clyde?
A. No, sir, what attracted me, he had passed and I waved at him, and then I spotted the car coming down the road, sideways, and I knew there had to be an accident.
Q. You knew that had to be an accident?
A. Yes.
Q. There wasn't anything in the world that Atlas Cuevas could do that you knew at that moment to avoid that collision, could he?
A. No, sir.
On recross-examination, Malley answered:
Q. Clyde, I am going to ask you with reference to the accident, you have testified that there was nothing unusual *324 that attracted your attention about the operation of that tractor when you saw the car coming down that side of the road, did you?
A. No.
Q. There was nothing that attracted your attention, unusual, about the operation of the tractor when you saw this car coming sideways?
A. No.
Q. So, at the time you put your hands over your eyes the reason you put your hands over your eyes was because the car had the road covered, wasn't it?
A. Yes, sir.
Q. It wouldn't make any difference where the tractor was, the car was going to hit it, wasn't it?
A. I was sure of that.
Clyde Malley was related to both Cuevas and Mrs. Shirley Malley Elsworth, the driver of the Pontiac Catalina who was instantly killed, yet he testified to what he actually saw with his own eyes.
The above testimony is what the majority finds so "inherently improbable and unbelievable when compared to the known facts as to amount to no evidence at all."
I assume that the "known facts" to which the majority opinion alludes are: the position of the tractor and automobile after the accident as portrayed in the pictures introduced, but we said in Hagan Storm Fence Co. of Mississippi v. Edwards, 245 Miss. 487, 148 So.2d 693 (1963), that this was a question for the jury.
This Court in Hagan, supra, stated the pertinent facts and then its reasoning and decision:
"Mr. Doyle arrived in Jackson the day before the trial in July 1961 and visited the scene of the accident and he based his conclusion as an expert witness on the position of the automobiles as related to him by others, the angle of the vehicles, and the photographs shown him, and placed the responsibility for the accident upon the Volkswagen driven by T.M. McGregor, employee of the appellant Hagan Storm Fence Company, and with the result that a verdict of $20,000 was rendered against the said defendant.
"The drivers of both the Volkswagen and the panel truck suffered from amnesia after the accident and neither of them could recall anything whatever about how the accident occurred. Therefore the trial court permitted the testimony of Mr. Doyle to be given as an expert on the ground of necessity, and of his qualifications as such as testified to by him.
"It should be observed that Mr. Doyle had no facts before him on which to reach his conclusions that the jury did not have. He testified from photographs that had been introduced in evidence, the location at which the two vehicles came to rest as necessarily related to him by witnesses, and testified as to the indicated speed of each automobile at the time of the accident, and of course he did not know the point of impact except from hearsay, and on the basis of his experience as hereinbefore set forth.
* * * * * *
"It has been the uniform rule in this state that we let the witness tell the facts and leave it to the jury to determine the conclusion to be drawn from the facts.

"We think that this case should be reversed and remanded for a new trial because of the error in the admission of the testimony of Mr. Doyle as an expert accidentologist." (245 Miss. at 491-493, 148 So.2d at 694-695). (Emphasis added).
The burden of proof was upon the appellants to establish by a preponderance of the evidence: (1) that Atlas Cuevas was guilty *325 of negligence in the operation of the tractor on the occasion in question, and (2) that such negligence proximately contributed to the collision and death of Shirley Malley Elsworth. "This burden is not met if the evidence, under the rule stated, leaves either of these questions in the realm of speculation or conjecture." We so said in Scott v. Lewis, 219 So.2d 662 at 664 (Miss. 1969), a case in which a young mother was killed in an automobile collision somewhat similar to this case. In Scott, we affirmed a directed verdict for the defendant.
Of course, in this case, the majority is reversing a jury verdict for the defendants and in the process is holding that the testimony of the only two eyewitnesses is inherently unbelieveable and the jury was not justified in deciding this case on their testimony because the photographs taken after the accident show the tractor largely in the north-bound lane of traffic. If there was any inference to be drawn from the position of the vehicles after the accident it was up to the jury to draw the inference and not this Court. This was a classic case for the jury to weigh the evidence, both direct and circumstantial, and then decide who was to blame.
These facts were undisputed: the tractor was proceeding south on the paved road at about 10 miles per hour, the Pontiac Catalina was proceeding in a northerly direction at a terrific rate of speed estimated by one witness at 80 miles per hour, the Pontiac was out of control and was rocking or weaving from side to side.
The majority speculates from the pictures that somehow the tractor got over on the wrong side of the road, and then somehow the 10-mile-per-hour tractor ran into the 80-mile-per-hour car. The jury could very logically have concluded that if Mrs. Elsworth had seen what she should have seen when at least 1,000 feet away and if she had had her car under control as every driver on the highway is presumed to have, then she could have slowed down and pulled over on the shoulder of the road and waited patiently for the tractor to pass, or she could have simply stopped her car, or she could have proceeded slowly around the tractor on the other side of the road. Suppose it had been a pedestrian or a bunch of children playing in the road. Woudn't she have had the last clear chance to avert an accident, and wouldn't she have been liable if she had not? Was this an unavoidable accident? Was it inevitable that she should continue to barrel down the road and hit a slowmoving tractor with such terrific force that the two front wheels of the tractor were driven up under the tractor and the right front side of her car was completely demolished? I think not.
In Kettle v. Musser's Potato Chips, Inc., 249 Miss. 212, 162 So.2d 243 (1964), Mrs. Kettle was hit by a south-bound car as she stood on the west side of U.S. Highway 51 after midnight. Bridgewater, the southbound motorist, claimed that he was partially blinded by the lights of a tractor that had stopped in the north-bound lane of the highway and did not see Mrs. Kettle.
As to Bridgewater's duty and responsibility as a motorist, this Court said:
"The general rule paraphrased is simply that when a motorist is blinded by lights, he must either stop if his vision is cut off completely, or, if not cut off completely, then he must proceed at such a rate of speed, and with such control of his vehicle, as to be able to stop in time to avoid any discernable object in the road ahead. B. Kullman & Company v. Samuels, 148 Miss. 871, 114 So. 807 (1927); Terry v. Smylie, 161 Miss. 31, 133 So. 662 (1931); Mississippi Power & Light Company v. Lembo, 202 Miss. 532, 32 So.2d 573 (1947)." (249 Miss. at 229, 162 So.2d at 248).
The Court then quoted with approval the following from Pullin v. Nabors, 240 Miss. 864, 128 So.2d 117 (1961):
"`[U]nder present day traffic conditions any driver of an automobile must be prepared *326 for the sudden appearance of obstructions in the street or highway, or of other vehicles at intersections, and his failure to act properly when they appear may be found to amount to negligence. * * * He (appellee) testified that he saw the red lights about a quarter of a mile away and that he knew that red lights indicated danger. Thus he sensed, or should have, that there was something on the highway that had a right to be there.'" (249 Miss. at 230, 162 So.2d at 248). (Emphasis added).
The Court, in Kettle, supra, then went on to say:
"Furthermore in Graves v. Johnson, 179 Miss. 465, 176 So. 256 (1937), we held that a driver would be presumed to have seen what he should have seen in the performance of the obligations required of him in a situation as it occurs. There was testimony in the Pullin case that the red lights flashing could be seen a mile west of the location of the collision. The appellee himself testified that he saw the red lights of the patrolman's car and he knew that there was danger ahead. We held that he is presumed to have seen the dangerous situation in the highway, and his failure to stop his automobile prior to colliding with the appellant was negligence. It appears that the overwhelming weight of the evidence shows that the appellee was grossly negligent and such negligence was the proximate cause of the collision and the resulting injuries to the appellant." (249 Miss. at 230, 162 So.2d at 248-249). (Emphasis added).
The Court very logically concluded:
"[W]e likewise hold here that the testimony of appellee Bridgewater conclusively establishes negligence in his operation of his car in the following particulars: Failure to slow down sufficiently and get his car under control, and stop if necessary when he saw the parked truck in the east lane with extremely bright lights and when he was blinded by them; failure to see the appellant in the road, or on the shoulder thereof; and since he is presumed to see what he should have seen, the failure to blow his horn or give any other signal; the failure to operate his car under said conditions in such a manner and at such a speed as would enable him to stop or avoid hitting the appellant." (249 Miss. at 234, 162 So.2d at 250). (Emphasis added).
This is an even stronger case against the appellant. This tragic accident happened in the middle of the morning on a clear day with no other traffic on the road and with the decedent having a clear, unobstructed view for at least 1,000 feet down a level road.
Since the jury's verdict was in favor of the defendants, as an appellate court "we must view the facts in the light most favorable to them, and consider as true all evidence in their favor, together with all reasonable inferences which may be drawn therefrom." Ill. Cent. R. Co. v. Williams, 242 Miss. 586 at 594, 135 So.2d 831 at 833 (1961).
Griffith, in his monumental work on Mississippi Chancery Practice, expresses this invariable rule in this way:
"It is a matter of constitutional right to all parties litigant to have their issues of fact submitted to and passed upon by the jury or chancellor, according to the ordinary practices of the forum in which a case is for trial; and it is a matter of constitutional right that the successful party there shall not have his cause reviewed except upon the record as there made, and that the findings of fact as there determined shall not be reversed unless clearly shown to be erroneous. It has therefore been the uniform rule that the chancellor's finding on the facts is reviewable on appeal only when manifestly wrong. And when two or more reasonable inferences are deducible from the facts in proof, the inference drawn and adopted by the chancellor will control *327 on appeal. This rule has its foundation not only in the imperative operation of the constitutional ordinances mentioned; it has a further controlling reason in this: The opportunities afforded to the trial court are far better for arriving at correct conclusions and findings upon all the questions of fact. Of this matter our supreme court has said:  `Here we have nothing but the naked record before us; there, in most cases, the parties themselves are in the presence of the court and testifying. The manner of testifying, and their appearance upon the witness stand, and many other things, are influential in determining the triers of fact;' or as said in another case: The decision of the chancellor where the evidence is conflicting will not be disturbed on appeal, since he is better able to determine the truth of the matter than the appellate court. * * *" (Griffith, Mississippi Chancery Practice 2d § 674, pp. 741-43 (1950)).
It appears to me that the great weight of the evidence supports the verdict of the jury; I certainly cannot say that they were manifestly wrong. I would affirm the judgment of the circuit court, based upon the jury verdict.
GILLESPIE, P.J., and JONES and SMITH, JJ., join in this dissent.
JONES, Justice (specially dissenting).
With deference, respect, and great reluctance, but with all the earnestness of which I am capable, I join in the above dissent and add a few lines thereto, all, as heretofore stated, with deference and respect. In my humble opinion, this decision violates all the principles which I have understood apply to an appellate reviewing court.
The majority gives no credence to Cuevas' statement that: "Well, that is what I don't know. I was knocked out," made in answer to the question: "Did your tractor ever leave the southbound side of the highway?" If he had desired to testify otherwise than truthfully, it would have been very easy for him to say that he pulled to the other side trying to avoid a collision!
Amnesia as a result of trauma from an automobile collision, is not unknown. In Hagan Storm Fence Co. v. Edwards, 245 Miss. 487, 148 So.2d 693 (1963), the drivers of both cars suffered with it, and neither could testify. The one afflicted may remember everything until just before the accident and from then on, nothing.
The majority split hairs by saying Clyde Malley did not see the cars at the instant of the collision. He testified that he was standing beside the road and that nothing unusual about the tractor attracted his attention; it was on its side of the road while the other car at a high speed was coming "sideways" down the road and when he saw a collision was inevitable, he put his hands over his eyes immediately before the accident to keep from seeing a tragedy. The majority says his evidence is not worthy of belief, even though he was introduced by the appellants, who vouched for his veracity.
Neither Cuevas nor Malley was impeached nor was their reputation for truth attacked. And as stated, appellants vouched for Malley when they put him on the stand.
The majority quotes witness Hogan as saying, "* * * the car was in the northbound lane * * * but turned almost completely sideways where the tractor drove into it." The fact that the car was "almost completely sideways" after the collision is corroborative of Malley's evidence. The balance of the statement is the conclusion of one who did not see the accident. Hogan said, and the pictures show, the car was hit in the right side about the front door or center.
This Court, as was said of the witness Doyle in Hagan, (a man of experience, education, and training) has no facts before it that the jury did not have to reconstruct the accident from physical signs. The jury here heard the evidence, saw the *328 witnesses, observed them on the stand, and examined all of the pictures mentioned by the majority.
The Court in Hagan said the expert's opinion invaded the province of the jury. How about this Court? It absolutely erases the evidence of unimpeached witnesses by looking at pictures which were seen by the jury, and considering only the pictures.
The Court here seems to do as the witness, Doyle, was said to have done in the special concurring opinion of Hagan:
It appears that he assumed that the vehicles came together without either driver having made any attempt to swerve. This may have been true, but it is against all experience. These two vehicles were in charge of drivers who had the power to control them. This witness seems to assume it was a collision between two unmanned objects, the lighter Volkswagen and the heavier panel truck. He does not take into account the probabilities that the driver of the panel truck or the driver of the Volkswagen, or both, may have (1) skidded at an angle just before the impact, or (2) turned the steering wheel to the right, or (3) turned the wheel to the left. 245 Miss. at 494, 148 So.2d at 701.
Here, there was an experienced tractor driver and meeting a car, which was, undoubtedly, out of control. Are we to refuse to believe the tractor driver endeavored to avoid a collision and thereby reached the point where his tractor was after the collision? Twelve men unanimously found that he did and was not liable for the tragic occurrence. This case is decided by five judges. Four cannot agree  the decision is five to four. When we cannot agree, can it be said that the unanimous decision of twelve men who listened, saw, and observed the witnesses and the pictures and everything we have before us, should be held to be without a reasonable basis?
Are we to presume that the tractor driver did nothing in an effort to avoiding colliding? Are we to presume that the automobile was hit in the right side because of the tractor driver's negligence, when appellants' own witness said that the car was coming "sideways" and out of control?
Are we to presume that the driver of the tractor did nothing to avoid an imminent collision, while we presume the reason the car was struck in the side was because the driver of that car was trying to avoid a collision? This, in the face of the statement of appellants' own unimpeached witness that the car was coming sideways?
It seems to me that the Court steps down from the high position from whence it reviews the trial, into the jury box, and there decides the case upon one fact, while ignoring the evidence of two witnesses, ignoring the natural instinctive responses of men to an emergency; and this, when the evidence and signs are reconcilable.
The twelve men who sat in the jury box were, I am sure, men of intelligence and in this age when cars and other motor vehicles are in universal use, I am sure they, as a whole, were as familiar with driving cars or tractors, and the natural impulses of men in emergencies as are the members of this Court  also, that they could observe a man testifying and determine the weight and worth of his testimony much better than we can when reading from an inanimate paper. In Hagan, this Court said the witness who had qualified in the lower court as an expert was no more able to determine the issue from signs alone, than the jury  Are we?
A motion for a new trial, asserting that the verdict was against the weight of the evidence, was filed and argued. The judge of the trial court, who, as the jury, had seen the pictures, heard and observed the witnesses, Cuevas and Malley on the stand, overruled the motion. Neither he nor the jury thought the testimony of these two men was unbelievable.
This Court places its whole reliance upon pictures taken after the accident, showing *329 where the vehicles came to rest and refuses to accept the sworn evidence of unimpeached witnesses as to what happened before the accident.
I feel there is no use to call attention to principles of law announced by the following decisions, but do so as that on which I rest my conception of the law in this case.
Plaintiff is bound by testimony of his own witness. Wright v. Gordon's Transport, 162 F.2d 590 (5th Cir.1947).
Appellant relies here on a claimed contradiction of Malley and Cuevas because the pictures show the vehicle after the accident in the wrong lane. This ignores, as heretofore stated, the instinctive reflexes and actions of men in the face of an imminent emergency, and the eyewitness' accounts.
The jury are the proper judges of the credibility, worth, and weight of testimony. Bowling v. Harrison, 47 U.S. (6 How.) 248, 12 L.Ed. 425 (Miss. 1848), and numerous citations of Mississippi decisions to this effect, listed in Mississippi Digest "Trial,".
Question of veracity is for the jury. Gulf M. & N.R. Co. v. Seymour, 148 Miss. 456, 114 So. 35 (1927); Newton v. Homochitto Lumber Co., 162 Miss. 20, 138 So. 564 (1932).
Evidence from which reasonable persons may honestly reach different conclusions presents jury questions. Mutual Life Insurance Co. of New York v. Savage, 31 F.2d 35 (5th Cir.1929). Burkett v. New York Life Insurance Co., 56 F.2d 105 (5th Cir.1932).
Even where facts are conceded and the inference is doubtful, there is a jury question. Miss. Cent. R.R. Co. v. Mason, 51 Miss. 234 (1875).
When more than one inference can be drawn from evidence, question is for the jury. Sovereign Camp, W.O.W. v. Banks, 177 Miss. 279, 170 So. 634 (1936); King v. King, 161 Miss. 51, 134 So. 827 (1931).
Of course, it requires no authorities to show that where there is a conflict in evidence; there is a jury question.
The jury has the right to disregard the testimony of any witnesses which they do not believe. Pitcher v. Rogers, 259 F. Supp. 412 (Miss. 1966).
In McCallum v. Laird, 244 Miss. 273, 275, 142 So.2d 32 (1962), our Court said:
When the controverted issue is in sharp dispute, the truth of the matter must be found by the trier of facts, who has the opportunity to observe the demeanor of the witnesses and who is therefore in much better position to make a correct determination than an appellate court, which can view only the printed page and test the several versions only in the light of reason. (emphasis added).
The entire Court is in sympathy with the child deprived of the companionship, manifested love, and guidance of a good mother, and certainly this writer is. It is usual, however, to instruct a jury not to let sympathy decide or influence the decision of an issue. I think the same instruction is applicable to us in the discharge of our duty and disregarding sympathy as we are required to do, I believe the jury verdict should stand.
Considering all instructions together as we should, I see no reversible error there.
I would affirm.
GILLESPIE, P.J., and SMITH and ROBERTSON, JJ., join in this dissent.