320 So.2d 793 (1975)
The MAGNOLIA HOSPITAL
v.
Terry Glen MOORE.
No. 48054.
Supreme Court of Mississippi.
August 18, 1975.
Rehearing Denied September 9, 1975.
*794 Sharp & Fisher, Corinth, for appellant.
Charles R. Wilbanks, Corinth, for appellee.
Before PATTERSON, SMITH and BROOM, JJ.
SMITH, Justice.
This is an appeal by Magnolia Hospital from a judgment for $75,000 entered against it by the Circuit Court of Alcorn County in a malpractice suit brought on behalf of Terry Glen Moore, a minor, against the hospital and Dr. D.W. Hamrick. The suit sought damages for personal injuries alleged to have been sustained by plaintiff in the course of a tonsillectomy performed at the hospital by Dr. Hamrick. The gravamen of the complaint in the declaration is reflected by the following statement in the declaration: "Said employees of the Magnolia Hospital, together with Dr. D.W. Hamrick, carelessly and negligently strapped the plaintiff to the operating table by strapping his legs below the knees, and tightening the straps to such a degree of tightness, that the strap severed the peroneal nerve in the plaintiff's left leg."
The trial was concluded by the submission of the case to a jury which returned a verdict exonerating Dr. Hamrick but awarding plaintiff $75,000 against Magnolia Hospital. It is from the judgment against it, entered pursuant to that verdict, that Magnolia Hospital has appealed. Plaintiff has not appealed from the verdict and judgment for Dr. Hamrick nor has plaintiff cross-appealed as to rulings of the trial court adverse to plaintiff.
Terry Glen Moore, the plaintiff, was 7 years old at the time of the operation on *795 June 7, 1968. The trial took place 4 years later, when he was 11.
At 8:45 a.m. on the morning of the operation, the patient was given one grain of nembutal to induce drowsiness and 1/300 grain of atropine to slow the heart and suppress secretions from the nose and throat. Shortly thereafter, he was transported on a rolling stretcher from his room to the surgical suite. At that time his condition from the medication administered was described as "groggy." An examination was made of the patient's heart, chest, lungs and throat. He was moved into the operating room designated for minor surgery and placed on the operating table. Present were Dr. Hamrick, a specialist in eye, ear, nose and throat and member of the Academy of Opthalmology and Otolaryngology, who had performed some 5,000 tonsillectomies in his career; Dr. Hasseltine, his assistant, a doctor with 25 years experience in the field; Mrs. Louise Ferguson, operating room supervisor, a graduate, registered nurse with 25 years experience as operating room supervisor; Mary Owens, a graduate registered nurse and a graduate of the University of Alabama School of Anesthesia, with 18 years experience as an anesthetist; Vennie Betts, scrub nurse, with 8 years experience, 4 in surgery, Nelsie Caise, circulating nurse, with 26 years experience; Mrs. Thomas Trantham, recovery room graduate nurse with experience in several hospitals in that capacity; and, Charles Brumley, attendant, with 4 years of college pre-med and 1 year of graduate work, with 1 year experience at the Magnolia hospital, handling an average of 70 patients each month.
There is no material dispute in the testimony of these people as to what occurred and what was done on the occasion of the tonsillectomy performed on Terry Glen Moore by Dr. Hamrick. It is undisputed that good medical practice requires the placing of a restraint strap across the legs of a patient about to undergo that type of surgery. The testimony is that this restraining strap was placed across the legs of the plaintiff above the knees after he had been placed upon the operating table in order to prevent his thrashing about during the operation and causing an injury to himself. The restraint strap is a fabric strap 67 inches long and 5 inches wide. As the patient lies on the operating table, the strap passes over his legs and over the sides of the table and is fastened under the table. This is the proper and necessary procedure according to generally accepted good medical practice. This fact is not disputed by Dr. Tutor, the only medical witness offered by plaintiff, who testified, however, that it was in keeping with good medical practice to place the strap either above or below the knees.
After plaintiff had been placed upon the operating table this restraining strap was placed across his legs above the knees by the attendant, passing across both legs, and was fastened under the operating table. The patient's hands were then tucked under his body. When these things had been done the anesthetist proceeded to administer vinethene, a quick acting type of anesthetic that puts the patient to sleep within two or three minutes. From that point on a mixture of ether and oxygen is used. Dr. Hamrick, who had been outside "scrubbing up," was notified that the patient was ready and entered the room. He tested the restraining strap, it was above the knees as usual, and found it to be of the proper tightness. Forty-five minutes later, the operation having been completed without incident, the patient was removed from the operating table and taken to the recovery room.
The testimony of the highly trained and experienced personnel who were present and participated on the occasion in question, was that, at every step, from his reception to his departure, plaintiff received every care and attention required or indicated by sound and generally accepted good medical practice.
*796 There is no material factual issue as to this unless it can be said to have been created by testimony given by the 11 year old plaintiff as to his knowledge and recollections of the events which had transpired in the operating room 4 years before when he had been 7 years old.
Even discounting proof in the record that plaintiff's intelligence and memory span were below normal, as well as his drugged condition when he entered the operating room, his testimony, offered to support the charge of negligence, is irreconcilably self-contradictory in its essential particulars. He testified at times, that he had asked Dr. Hamrick in the operating room (that being the only place the restraining strap was used) to loosen the strap "a bit." Several other times he said that he had not seen Dr. Hamrick in the operating room at all. In answering interrogatories, (these were apparently answered by his father who was not present in the operating room), it was stated that a "strong, flexible material which looped around the arms and legs and was applied above the elbows on each arm and put below the knee on each leg." Many important questions addressed to plaintiff himself, as a witness, brought no response of any kind, although they were repeated time and again, and question after question received the answer, "I don't remember."
The record of the testimony of plaintiff forces the inescapable conclusion that, after 4 years, actually he did not recall, if he ever knew, where or what strap or straps were placed upon him. Nor is it possible to reconcile his conflicting statements as to what happened in the operating room. But aside from the impossibility of reconciling the material conflicts in plaintiff's testimony, the request of this young boy, if there was such a request, that the restraining strap be loosened a bit does not amount to proof that it was tighter than required by good medical practice.
The expert testimony of those in a position to know, was to the contrary.
Plaintiff returned no answer whatever to question after question and a very large percentage of those questions addressed to him relating to the placing of the strap were answered, "I don't remember." He said, at least once, that he did not know how the strap had been placed and explained this lack of knowledge by saying that he could not see so good. On cross-examination, he stated that he could not remember whether the straps were actually placed on him or not. The testimony of this witness is irreconcilably conflicting on the crucial point. It is contrary to the overwhelming weight of the credible evidence in the case and is incapable of supporting a finding that negligence or a departure from good medical practice on the part of the hospital employees or Dr. Hamrick caused a traumatic injury to the peroneal nerve of his left leg.
The only medical evidence offered by the plaintiff was given by Dr. Tutor. Several months after the tonsillectomy, Dr. Tutor had operated on plaintiff and found that the superficial peroneal nerve of the left leg was bound down with scar tissue over the head of the fibula, that the nerve was not severed, and he freed it from the scar tissue. He said that the injury to the nerve was external, indicating "some sort of trauma to the nerve." Dr. Tutor stated that there was no way to determine the particular trauma that caused the injury but, whatever it was, in order to cause the injury, it would have had to be of such force as would cause discoloration (bruising) and swelling in the area where the trauma occurred and that such swelling and discoloration would have been observable.
Moreover, according to Dr. Tutor it was his opinion that it would have been possible to have sustained the trauma, feel the pain and have a superficial bruise and swelling appear and have the bruise and swelling disappear in three days or a week and then a period of two weeks or so elapse before the scar tissue began to develop *797 or a deficiency began to develop in the neurological function (of the foot).
Dr. Tutor also testified that it was in keeping with good medical practice to place a restraining strap across the patient's legs, either above or below the knees, during surgery. He said he had never performed a tonsillectomy and did not know whether the operation was done while a patient was sitting or lying down, as he had never observed a tonsillectomy performed. He added, however, that he thought most strapping was done below the knee and this also was in keeping with good medical practice. He said, and it appears to be conceded, that a strap placed above the knee would have been incapable of producing the injury.
Appellee's injury involved the superficial peroneal nerve at a point below the left knee. According to Dr. Tutor, "It is probably the most commonly injured nerve in the lower extremity because of it being so superficial."
In describing the vulnerability of the superficial peroneal nerve to injury the testimony of Dr. Tutor was as follows:
Q. Could this, could what you observed in this Terry Moore, the condition which you observed in his leg, could it have resulted from him bumping his leg against something, or something of that nature?
A. Yes, sir. Any significant trauma to that particular area, the nerve being so vulnerable as it is to trauma could produce a, a foot drop. Yes, sir. I see it all time. In fact, we often see people that apparently get a foot drop simply from crossing their legs; that is, pressure of one leg on the other at this point of, of vulnerability of the peroneal nerve as it comes across the head of the fibula; and we often, or I do, often instruct a patient to try to remember not to cross his legs because of the likelihood of trauma.
Q. And could the injury that you observed in Terry Glen Moore come, could it have come from that source?
A. It could have come from any trauma. Yes, sir.
Q. Then, from what you have said, the bumping the leg, crossing legs, or any number of things could have caused the onset of this condition equally as well as placing the strap on the legs?
A. Yes, sir.
When Dr. Hamrick called at the plaintiff's room later in the day on which the tonsillectomy had been performed, it is undisputed that he found the patient was having trouble with his foot. The coincidence that this manifestation of the consequences of a previous traumatic injury to the peroneal nerve followed the operation by only a few hours is cited as "proof" of causal connection. Dr. Tutor testified that the traumatic injury of the nerve would produce at the time of such injury a visible result consisting of swelling and bruising. The disability to the foot might ensue two weeks or more after these visible signs had disappeared. No bruising or swelling was apparent at the site of the alleged injury on the day of the operation. Moreover, because of the absence of the swelling and bruising, which Dr. Tutor said would necessarily occur, it is equally possible, to say the least, that a more remote injury caused the disability which only manifested itself coincidentally on the day of the operation.
The fact that impairment of the foot had actually become apparent on the day of the operation is not, under Dr. Tutor's testimony, evidence of causal connection between procedures in the operating room and the basic traumatic injury which necessarily had preceded it. According to Dr. Tutor, the initial injury might have been sustained from any one of a number of causes, and there was no way to determine which of such causes had brought it about. Dr. Tutor also said that in the two weeks *798 or longer period which might elapse between the original trauma (resulting from crossing one's legs, etc.), and the consequent disability, the swelling and bruising might have disappeared, and the incident long since have been forgotten. Dr. Tutor stated: "And there is no way of knowing" what particular trauma had caused the injury.
Terry Cooper Moore, father of plaintiff, answering interrogatories which had in fact been propounded to his son, in reply to a question as to whether "there was any change in the physical appearance or color on any portion of the (Plaintiff's) body included in the complaint," said: "None noticed immediately after the operation." Later, however, he undertook to say that he had noticed a small red mark on the side of plaintiff's left leg. On cross-examination about this conflict in his statements he was asked: "Now, Mr. Moore, why, in answer to that question, did you not mention this redness that you knew about on the day following the injury at least? A. Well, in this particular case, it was very minor, just a little redness, could have been from lying on a sheet or something or other of that nature."
There was no indication of any bruising or swelling, such as that described by Dr. Tutor and which he said would have occurred at the time of an initial traumatic injury severe enough to cause the condition of scarring which had been disclosed by the surgery performed by him.
It is contended by appellee that Dr. Tutor's answer to a hypothetical question propounded to him is sufficient to support a finding that improper placing of the restraint strap "probably" had caused the injury. This proposition is based on the following question addressed to Dr. Tutor:
Q. And let us assume, Doctor, that the evidence as shown will show in this cause that this child was taken to the operating room; that the strap was placed on his, just below his knees; and at that time he complained of the straps hurting him; and then immediately after that he was put to sleep. Would you have an opinion as to the probable cause of his injury?
Upon the basis of the data contained in the above question, plus a "history supplied" him, Dr. Tutor answered: "That it was the probable cause of it, the most likely cause of it, with the history as supplied me." In Cates v. State, 171 Miss. 106, 157 So. 95 (1934), this Court stated the rule as to hypothetical questions addressed to expert witnesses thus:
Where hypothetical questions are resorted to in the examination of expert witnesses, they must be so framed as to fairly reflect facts either admitted or proved, otherwise the testimony drawn out by them can have no real value, but may do much harm in the decision of the case, it being held that before a witness will be allowed to give his opinion as an expert upon a state of facts, knowledge of which he derives from other witnesses, he must be put in possession of all the facts, as ascertained or supposed, on the question about which the inquiry is made, and that an opinion given upon a partial statement of the facts is inadmissible and of no value. (157 So. at 99).
Where facts are conflicting, the party producing expert witnesses may state facts in hypothetical questions in accordance with his theory, but is not authorized to omit undisputed material evidence bearing on the issue and calculate it (sic) to influence decision; but he must state the facts whenever they are not disputed. Cates v. State, 171 Miss. 106, 157 So. 95. [Mississippi Power Company v. Harrison, 247 Miss. 400, 152 So.2d 892, 900 (1963)].
The assumption in the question, obviously based upon parts of plaintiff's testimony, that a complaint was made or a request to Dr. Hamrick was made in the operating room to loosen the strap is not supported by credible evidence or evidence of any substantial probative value. Plaintiff's testimony *799 on this point is conflicting and the conflicts are incapable of being reconciled. Moreover, the test is whether what was done comported with generally accepted good medical practice. That it did is supported by the testimony of both Dr. Hamrick and Dr. Tutor. A request by a child patient, even if made, that the restraint strap be loosened "a bit" because his leg hurt, is not evidence that it was, in fact, too tight by standards of good medical practice. There is no evidence that the strap was tighter than necessary or tighter than required by good medical practice or tight enough to cause injury to the peroneal nerve.
The question as propounded contains insufficient data to form a basis upon which a medical expert could reach a trustworthy opinion, based upon reasonable medical certainty. It does not, in fact, call for an expert opinion based upon reasonable medical certainty. Dr. Tutor, like anyone else, may have formed some kind of "opinion", but only opinions formed by medical experts upon the basis of credible evidence in the case and which can be stated with reasonable medical certainty have probative value. Moreover, it appears that the "history" mentioned by Dr. Tutor was given him by plaintiff's father and included "facts" not in evidence and thus was not a proper consideration as a basis for arriving at an expert opinion. In Big Sandy Community Action Program v. Chaffins, 502 S.W.2d 526 (Ky. 1973), the Kentucky Court said:
It seems to us that there is a practical difference between subjective symptoms and a case history. It is one thing for a patient to tell a physician how he feels and where he hurts and another to tell him what has happened, either yesterday, last year or 10 years ago. Though both may be of equal importance to the physician, it is far easier for the patient to fabricate or embellish upon past facts than to feign existing symptoms. The doctor ordinarily is in a better position to assess the genuineness of the symptoms than he is to judge the accuracy of the history. It is our opinion that the law in this state goes quite far enough in permitting him to consider the subjective symptomatology displayed by one who is claiming or about to claim legal relief, and that for purposes of opinion testimony he should not be permitted to take into consideration the patient's case history. We therefore conclude that objections to such testimony are well taken. (502 S.W.2d at 529).
Expert opinions may not be based on information or "histories" furnished to the expert by third persons. Dennis v. Prisock, 221 So.2d 706 (Miss. 1969); Spears v. State, 241 So.2d 148, 149 (Miss. 1970).
Moreover, it was necessary that these additional data, reflected by uncontradicted testimony, be included in the question and taken into consideration by Dr. Tutor in forming an opinion:
(1) There was no bruising (discoloration) or swelling following the operation at the site of the alleged traumatic injury; and
(2) The impairment of the use of the foot had manifested itself within a few hours after the operation.
In the light of Dr. Tutor's testimony, these facts were indispensable to the formation of a valid or trustworthy medical opinion based upon reasonable medical certainty as to whether the original trauma had more probably occurred during the operation or at some time during the previous two weeks or so.
What was discovered at the hospital within hours after the completion of the operation was not evidence of the external trauma to the leg itself which, according to plaintiff's medical expert, would consist of visible bruising and swelling at the site of the trauma, manifesting itself at the time and disappearing within two or three days. *800 The testimony is that there was none. The disability of the foot noticed at that time was but a symptom of a previous traumatic injury to the leg involving the superficial peroneal nerve which might have occurred at any time during the previous two weeks or so which preceded the noticed impairment of the use of the foot.
Appellee suggests that if the injury did not happen as alleged, that it was incumbent upon Magnolia Hospital to show how it did happen, and that unless this was done the hospital is liable. This burden did not rest upon the hospital.

Negligence is not presumed, rather it is presumed ordinary care has been used. The person charging negligence must show that the other party, by his act or omission, has violated some duty incumbent upon him and thereby caused the injury complained of....
[DeLaughter v. Womack, 250 Miss. 190, 208, 164 So.2d 762, 769 (1964)] (Emphasis added).
The jury's natural sympathies in the case may have found expression in its inconsistent verdicts whereby Dr. Hamrick was exonerated and a verdict was rendered against the hospital. Thus, it necessarily follows that the jury accepted Dr. Hamrick's testimony that he had tested the tightness and placement of the strap before beginning to operate and had found them proper but somehow found at the same time, as to the hospital, that it had been too tight.
In Elsworth v. Glindmeyer, 234 So.2d 312 (Miss. 1970), it was said:
[A] jury verdict is no magic talesman or philosophers' stone which can by its pronouncement per se change the base ore of impossibility into the royal metal of fact. A verdict does not by its utterance create that which cannot be determined rationally to have existed. A verdict cannot metamorphose an incredible assumption into a plausible fact worthy of being accepted as a reality.... (234 So.2d at 321).
In Elsworth, the Court set forth, among others, these principles:
1. [B]elievable or credible evidence in civil cases is that which is reconcilable with the probabilities of the case and that bare possibilities are not sufficient... .
2. Verdicts must rest on probabilities, not on bare possibilities. There is not capacity in any number of the former to create the latter. So the person on whom the burden of proof rests to establish the right of a controversy, must produce credible evidence from which men of unbiased minds can reasonably decide in his favor... .
(234 So.2d at 318).
In John Morrell & Company v. Shultz, 208 So.2d 906, (Miss. 1968), plaintiff claimed to have suffered food poisoning from eating a potted meat product marketed by Morrell. Plaintiff's doctor testified that, from the case history given him by plaintiff, it was his opinion that the product had been defective and had caused her sickness. On cross-examination, however, he admitted that his conclusions were based on what plaintiff had told him and that her illness might have as easily resulted from some other cause. The doctor said plaintiff's complaint was a common one, such as he saw every day in his practice, very much as Dr. Tutor said here: "Yes, sir. I see it all the time. In fact we often see people that apparently get a foot drop simply from crossing their legs... ." In Morrell, this Court reversed, saying:
It is well settled in this jurisdiction that a verdict may not be based upon surmise or conjecture and that to prove a possibility only is insufficient to make a jury issue. The scintilla rule of evidence is not recognized within this state. See Berry v. Brunt, 252 Miss. 194, 172 So.2d 398 (1965), and the numerous cases therein cited to the same effect.

*801 In reviewing the evidence in its best light for the plaintiff the proof amounts to no more than a scintilla that the plaintiff's illness was caused by the potted meat and is insufficient, therefore, to support the verdict of the jury. The cause is reversed and rendered.
(208 So.2d at 907).
Plaintiff failed to meet the burden of proving (1) negligence or departure from good medical practices by hospital attendants, and (2) that any negligence or departure from good medical practices proximately caused or contributed to the injury of plaintiff. As said in Elsworth, supra, "A verdict does not by its utterance create that which cannot be determined rationally to have existed."
The jury should have been peremptorily instructed to return a verdict for Magnolia Hospital.
Reversed and judgment here for Magnolia Hospital.
GILLESPIE, C.J., RODGERS, P.J., and INZER, ROBERTSON, SUGG and WALKER, JJ., concur.