## IN THE SUPREME COURT OF MISSISSIPPI
## NO. 93-KA-00741-SCT

*VERNON RAY CATCHINGS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 2/9/93 |
| TRIAL JUDGE: | HON. L. BRELAND HILBURN, JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | DONALD W. BOYKIN |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  W. GLENN WATTS |
| DISTRICT ATTORNEY: | NA |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 5/16/96 |
| MOTION FOR REHEARING FILED: | 5/29/96 |
| MANDATE ISSUED: | 9/26/96 |

**BEFORE PRATHER, P.J., PITTMAN AND ROBERTS, JJ.**

**PRATHER, PRESIDING JUSTICE, FOR THE COURT:**

### I. INTRODUCTION

¶1. Vernon Ray Catchings was convicted in the Hinds County Circuit Court, First Judicial District, for murder and sentenced to life imprisonment. His motion for judgment notwithstanding the verdict (JNOV), or in the alternative, a new trial, was denied. On appeal, Catchings raises the following issues:

**A. WHETHER INSTRUCTION S-5 SHOULD HAVE BEEN DENIED BECAUSE DELIBERATE DESIGN CANNOT BE FORMED AT THE MOMENT OF THE ACT OF VIOLENCE?**

**B. WHETHER INSTRUCTION D-12 CONCERNING CATCHINGS' RIGHT TO STAND FIRM AND NOT FLEE SHOULD HAVE BEEN GRANTED?**

**C. WHETHER THE TRIAL COURT ERRED BY ALLOWING DR. JOHN NEILL TO GIVE AN OPINION AS TO THE VICTIM'S CAUSE OF DEATH AND BY NOT GRANTING INSTRUCTIONS D-14 AND D-15?**

**D. WHETHER INSTRUCTION S-1 SHOULD HAVE BEEN DENIED BECAUSE IT IN EFFECT AMENDED THE INDICTMENT, OR WAS OTHERWISE IN SIGNIFICANT VARIANCE WITH THE INDICTMENT AND, BECAUSE THERE WAS NO EVIDENTIARY BASIS FOR THAT PART OF THE INSTRUCTION CONCERNING AN ACT DANGEROUS TO OTHERS?**

**E. WHETHER THE TRIAL COURT SHOULD HAVE GRANTED INSTRUCTION D-17, DEFINING DELIBERATE DESIGN?**

**F. WHETHER THE TRIAL COURT SHOULD HAVE GRANTED INSTRUCTION D-7, THE "SINGLE JUROR" INSTRUCTION?**

**G. WHETHER THE EVIDENCE SUPPORTED CATCHINGS' CONVICTION?**

## II. STATEMENT OF THE FACTS

¶2. This case involves an incident which took place outside the Short Stop convenience store on the corner of Corinth Street and Lynch Street in Jackson on November 3, 1990. The appellant, Vernon Ray Catchings, struck the victim, Major Cassidy, in the head with a saw horse. The force of the blow severed the victim's nose and knocked him to the ground. The victim was hospitalized that day and died approximately seven weeks later. The evidence indicated that Cassidy had not provoked or attacked Catchings. However, Catchings testified that he acted in self-defense. The record reflects the following:

¶3. Catchings entered the Short Stop that day and ordered some chicken; according to witnesses, he was "rowdy" and "upset," and was talking loudly to the female cook. The victim approached Catchings and told him that he did not have to talk like that. Catchings then "got real loud." The cashier knew the victim; he asked the victim to leave, because Catchings was getting louder. The victim complied, and Catchings ran out of the store behind him.

¶4. One witness testified that the victim was not turned toward Catchings and that he was not paying attention to Catchings, when Catchings charged him with the sawhorse. The victim apparently saw Catchings' approach and turned around, but Catchings was too close for him to move out of the way.

¶5. As soon as Catchings struck Cassidy, he set the sawhorse down, turned around, and said, "Hey, y'all want some of this, too?" Catchings re-entered the store and asked, "Anybody else want any?" Catchings cursed the cook, snatched up his bag of chicken, and left. He did not try to help the victim.

¶6. Two witnesses testified that Catchings never seemed to be afraid of the victim; they stated that the victim was child-like and passive -- an "easy mark." They did not see a weapon in the victim's hand, and they did not believe that the victim had done anything to provoke Catchings.

¶7. On the other hand, Appellant Catchings testified that he had gone into the store to purchase some food and he was sitting on a stool waiting for his change, when Cassidy (the victim) approached him. According to the appellant, Cassidy poked him in the back with a small pocket knife and asked why the appellant was "sitting on his [expletive] stool." Cassidy then went outside. Because Catchings wanted to know why he had been stuck, he followed Cassidy outside to talk. Catchings testified that he had no intention of harming Cassidy.

¶8. Catchings said, "Hey, man, what's your problem." According to Catchings, Cassidy then waved the knife and cursed and threatened him. Catchings turned and grabbed the sawhorse to defend himself; he swung, and the sawhorse hit Cassidy in the bridge of the nose.

¶9. Catchings stated that he was afraid because there were a lot of people on the street corner and he was new in that neighborhood. He went back inside the store. Catchings did not know why he asked if "anybody want some of this" -- he testified that it was a "reaction." He would have liked to have left immediately, because he was afraid; however, he had left a $20 bill on the counter. Catchings later went home; he did not help Cassidy, because Cassidy had tried to take his life.

¶10. Cassidy was transported to the emergency room at Methodist Medical Center, where he was treated by Dr. John Neill, a specialist in neurological surgery. Cassidy was awake but would not talk; he was acutely intoxicated and had a blood alcohol level of .299. Dr. Neill ran a computerized axial tomography (CAT) scan, which revealed a skull fracture, as well as blood over the surface of Cassidy's brain. Cassidy was admitted to the hospital for observation. Over the next two days, he became increasingly sleepy. Another CAT scan revealed that Cassidy had a large hemorrhage and blood clot in the frontal portion of his brain on the right side. Dr. Neill operated to remove the clot. After the surgery, Cassidy became paralyzed on the left side of his body. Dr. Neill believed that the blood clot and the paralysis it caused were related to the blow that Cassidy received.

¶11. Cassidy was on a ventilator and remained in the intensive care unit for some time. Dr. Neill ordered a second and third CAT scan, which showed that Cassidy was developing a subdural hematoma and hydrocephalus, which is the accumulation of spinal fluid in the brain. On December 21, 1990, Cassidy died. Dr. Neill testified that Cassidy "certainly did not appear to be a very healthy individual" as he had enzyme abnormalities, which could mean that he had liver injury, usually associated with heavy drinking, or because he was taking Dilantin, a seizure medication that can produce abnormalities in liver enzymes.

¶12. Dr. Neill did not think that the liver disease was life-threatening or caused his death. Dr. Neill listed the cause of death on the death certificate as "Cerebral hemorrhage, traumatic. Interval between onset and death, weeks," and also testified that "being hit over the head" caused Cassidy to die.

¶13. Dr. Stephen Timothy Hayne, a forensic pathologist, testified that he had reviewed Cassidy's medical records and that they revealed that Cassidy had liver disease. Dr. Hayne thought it "unlikely" and "a remote possibility" that Cassidy died from the liver disease. However, Dr. Hayne could not exclude liver disease as Cassidy's cause of death. Dr. Hayne also stated that, without an autopsy, the clinical treatment of Cassidy when he was alive would not be sufficient for someone to render an opinion within a reasonable medical certainty as to the manner of Cassidy's death. Dr. Hayne further testified that it would be a reasonable conclusion, approaching reasonable medical certainty, that Cassidy died from "getting hit on the head or circumstances that emanated from that."

## III. LEGAL ANALYSIS

## A. WHETHER INSTRUCTION S-5 SHOULD HAVE BEEN DENIED BECAUSE DELIBERATE DESIGN CANNOT BE FORMED AT THE MOMENT OF THE ACT OF VIOLENCE?

¶14. The following instruction was given, over Catchings' objection, as S-5:

The Court instructs the Jury that malice aforethought does not have to exist in the mind of the slayer for any given length of time; and if at the moment of the act of violence, if any, the defendant Vernon Ray Catchings acted with the deliberate design to take the life of Major Cassidy, and not in necessary self-defense, real or apparent, then it was as truly malice and the act was as truly murder as if the deliberate design had existed in the mind of Vernon Ray Catchings for minutes, hours, days, weeks or even years.

¶15. Catchings argues that instruction S-5 conflicts with the holding in *Windham v. State*, 520 So. 2d 123 (Miss. 1987). In *Windham*, an instruction similar to S-5 was given. *Id.* at 125. This Court held that:

While it is no doubt true that a deliberate design to kill a person may be formed very quickly, and perhaps only moments before the act of consummating the intent, it is a contradiction in terms to state that a "deliberate design" can be formed at the very moment of the fatal act. Moreover, it is possible for a deliberate design to exist and the slaying nevertheless be no greater than manslaughter. It can thus be seen that **this special murder instruction granted the State rules out manslaughter, and is in hopeless conflict with the manslaughter instruction.**

*Id.* at 126 (citations omitted) (emphasis added).

¶16. In the case at hand, a manslaughter instruction was also given. Where deliberate design and manslaughter instructions are given, and "where under the evidence the jury might reasonably have concluded that the defendant acted in the heat of passion, we will . . . ordinarily reverse." *Blanks v. State*, 542 So. 2d 222, 227 (Miss. 1989)

¶17. However, in *Nicolaou v. State*, 534 So. 2d 168 (Miss. 1988), this Court held that giving the "deliberate design" instruction and a manslaughter instruction was harmless error where the manslaughter instruction was not warranted under the evidence of the case. *Id.* at 173. Thus, whether the giving of the deliberate design instruction constitutes reversible error depends on whether the giving of the manslaughter instruction was warranted by the evidence in this case. *See Blanks*, 542 So. 2d at 227; *Nicolaou*, 534 So. 2d at 173.

¶18. Manslaughter is "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense." Miss. Code Ann. §97-3-35. There is no evidence in the record that Catchings acted in the heat of passion. Catchings' own testimony was that he went outside the Short Stop to talk to Cassidy and that he had no intention of harming Cassidy. Catchings also testified that, once outside, Cassidy waved a knife at him, cursed him, and threatened him.

¶19. It appears from the record that the defense raised by Catchings at trial was self-defense. In which case,

there is no reasonable factual scenario under which the jury may reasonably have concluded, [under the deliberate design instruction], that [the appellant's] premeditated design to kill, if any existed in his mind but for an instant before the fatal act. On the prosecution's interpretation of the evidence, the premeditated or deliberate design existed well before the [slaying]. On the defense theory, it never existed. In this context, we declare the granting of [the deliberate design instruction] as harmless error.

*Blanks*, 542 So. 2d at 227. Thus, the manslaughter instruction was not warranted in this case. *See Id.*

Therefore, the giving of the deliberate design instruction was harmless error.

## B. WHETHER INSTRUCTION D-12 CONCERNING CATCHINGS' RIGHT TO STAND FIRM AND NOT FLEE SHOULD HAVE BEEN GRANTED?

¶20. Proposed instruction D-12 was not given:

> Flight, or fleeing the scene, was a means of escaping danger to which Vernon Catchings was not bound to resort. So long as he was in a place where he had a right to be, and was not the immediate provoker or aggressor, he had the right to stand his ground and resist force by force without losing the right of self-defense.

¶21. The trial judge found that this instruction was not supported by the evidence. "Before an instruction may be granted, there must be in the record an evidentiary basis for it." *Neal v. State*, 451 So. 2d 743, 761 (Miss. 1984).

> The refusal of a timely requested and correctly phrased jury instruction on a genuine issue of material fact is proper, only if the trial court -- and this Court on appeal -- can say, taking the evidence in the light most favorable to the party requesting the instruction and considering all reasonable favorable inferences which may be drawn from the evidence in favor of the requesting party, that no hypothetical, reasonable jury could find the facts in accordance with the theory of the requested instruction.

*Ferrill v. State*, 643 So. 2d 501, 505 (Miss. 1994).

¶**22. "**It has always been the law in this state that a defendant is not deprived of the right to claim self-defense in a slaying even if he could have avoided the threat to his safety by fleeing." *Cook v. State*, 467 So. 2d 203, 210, (Miss. 1985) (quoting *Haynes v. State*, 451 So. 2d 227, 229 (Miss. 1984). Furthermore,

> [f]light is a mode of escaping danger to which a party is not bound to resort, so long as he is in a place where he has a right to be, and is neither engaged in an unlawful, nor the provoker of , nor the aggressor in, the combat. In such case he may stand his ground and resist force by force, taking care that his resistance be not disproportionate to the attack.

*Id.*

¶23. In the case *sub judice*, all of the witnesses, except Catchings, testified that the victim did nothing to provoke Catchings. Catchings' own testimony was that he followed the victim from the store and asked, "Hey, man, what's your problem?" Therefore, because Catchings was the provoker or aggressor, the trial judge correctly ruled that Catchings was not entitled to a "stand your ground" instruction.

## C. WHETHER THE TRIAL COURT ERRED BY ALLOWING DR. JOHN NEILL TO GIVE AN OPINION AS TO THE VICTIM'S CAUSE OF DEATH AND BY NOT GRANTING INSTRUCTIONS D-14 AND D-15?

¶24. Catchings argues that expert opinions which are not "stated to a reasonable medical certainty" are not admissible and cites *West v. State*, 553 So. 2d 8 (Miss. 1989). At trial, Catchings objected to the form of

the question when Dr. Neill was asked about the cause of Cassidy's death. The objection was overruled. Catchings also contends that proposed jury instructions D-14 and D-15 should have been given. D-14 stated, "The testimony of Dr. John Neill is not probative, and you are instructed to completely disregard his testimony." D-15 stated, "Dr. John Neill gave his opinion as to the cause of Major Cassidy's death. His opinion is not probative as to the cause of death, meaning that his opinion as to cause of death has no value. You shall disregard his opinion."

¶**25.** In *West v. State*, the case cited by Catchings, a doctor testified regarding necrophilia generally, and did not discuss whether that specific defendant was a necrophile. This Court held: "Expert opinion testimony not tied to the individual whose behavior is at issue and not stated with reasonable certainty flunks the [admissibility] test." *Id.* at 21. The case at hand varies a bit from *West* in that Dr. Neill treated Cassidy from his arrival at the emergency room until his death some seven weeks later. Thus, the medical evidence as to cause of death was tied to the individual; however, it was not specifically stated as a "reasonable medical certainty."

¶26. "Within the medical discipline, the traditional standard for 'factfinding' is a 'reasonable medical certainty."*Bethany v. Stubbs*, 393 So. 2d 1351, 1354 (Miss. 1981) (citations omitted). Furthermore, "only opinions formed by medical experts upon the basis of credible evidence in the case and which can be stated with reasonable medical certainty have probative value." *Magnolia Hospital v. Moore*, 320 So. 2d 793, 799 (Miss. 1975). Although these cases pre-date adoption of the present Rules of Evidence, the standard expressed in both the cases cited and the rule adopted, was not changed.

¶27. Mississippi Rule of Evidence 703 discusses the bases of opinion testimony by experts:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

¶28. The issue here is whether medical experts are required to state their opinions "to a reasonable medical certainty" in order that their opinions be given probative value and therefore be admissible as evidence. Although this Court has not addressed this specific question, this Court can find analysis of the issue under the Federal Rules of Evidence, a course to which this Court has looked for analysis in other issues. *Hopkins v. State*, 639 So. 2d 1247, 1250 (Miss. 1993) (citing *Johnson v. State*, 529 So. 2d 577, 587 (Miss. 1988)). Further analysis of the federal rule and the Mississippi rule of evidence at issue here does not reveal a conflict exists between the two rules.

¶29. A similar challenge was made in the federal case of *LeMaire v. United States*, 826 F. 2d 949 (10th Cir. 1987), when the plaintiff argued that the testimony of the defense's medical expert was "not competent because he failed to state his opinions in terms of a "reasonable degree of medical probability." Applying Colorado substantive law that a medical opinion is admissible if founded on reasonable medical probability, the federal court held the expert testimony admissible. Further, the court held "the fact that the expert cannot support his opinion with certainty goes only to its weight not its admissibility." *Id.* at 953.

¶30. In the federal case of *Schulz v. Celotex Corporation*, 942 F. 2d 204 (3rd Cir. 1991), the court also held that an attending physician's failure to use the words "reasonable medical certainty" did not require exclusion of the testimony. The use of the word "certainty" is more applicable to Mississippi's rule of

evidence and cases interpreting it. The analysis in *Schulz* is as follows:

> One commentator has explained that "there is nevertheless an undercurrent that the expert in federal court express some basis for both the confidence with which his conclusion is formed, and the probability that his conclusion is accurate." Hullverson, *Reasonable Degree of Medical Certainty: A Tort et a Travers*, 31 St. Louis U.L.J. 577, 582 (1987). To that extent, the phrase "with a reasonable degree of medical certainty" is a useful shorthand expression that is helpful in forestalling challenges to the admissibility of expert testimony. Care must be taken, however, to see that the incantation does not become a semantic trap and the failure to voice it is not used as a basis for exclusion without analysis of the testimony itself. *LeMaire v. United States*, 826 F.2d 949, 954 (10th Cir.1987) (applying state law, entire testimony examined to determine if opinion expressed with the requisite degree of certainty).

> Situations in which the failure to qualify the opinion have resulted in exclusion are typically those in which the expert testimony is speculative, using such language as "possibility." *State v. Harvey*, 581 A.2d at 495; *Mayhew v. Bell S.S.*, 917 F.2d at 963 (Expert testified: "suspicious that it could have been"); *Grant v. Farnsworth*, 869 F.2d at 1152 ("could only guess"); *Kirschner v. Broadhead*, 671 F.2d 1034, 1039-40 (7th Cir.1982) (possibility is not an affirmative basis for a finding of fact). Phrases like "strong possibility," or "20-80% probability," also invite speculation. *Chaney v. Smithkline Beckman Corp.*, 764 F.2d 527, 529-30 (8th Cir.1985).

> In some cases, the courts are more demanding in requiring a degree of certainty in predictions of future consequences.

> Accordingly, while the particular phrase used should not be dispositive, it may indicate the level of confidence the expert has in the expressed opinion. Perhaps nothing is absolutely certain in the field of medicine, but the intent of the law is that if a physician cannot form an opinion with sufficient certainty so as to make a medical judgment, neither can a jury use that information to reach a decision. *McMahon v. Young*, 442 Pa. 484, 276 A.2d 534, 535 (1971).

*Id.* at 207. [citations and footnote omitted].

¶31. In the case before us, Dr. Neill treated the victim from the date of his injury until his death seven weeks later. He ordered numerous tests to be obtained to aid him in his diagnosis and observed Catchings' reactions to medication and surgical procedures; he was a specialist in neurological surgery. Based upon all of the above, he expressed his opinion as to the cause of death in unequivocal standing alone, but not unequivocal in relations to other testimony terms. This Court holds that the testimony given, although without the use of the words "to a reasonable medical certainty," evidences the certainty requisite for admission. To the extent that our previous cases may have intimated otherwise, they stand modified. *See e.g., Bethany* 393 So. 2d at 1354 and *Magnolia Hosp.* 320 So. 2d at 799 The trial judge did not err in admitting Dr. Neill's testimony, nor in denying Instruction D-14 and D-15.

**D. WHETHER INSTRUCTION S-1 SHOULD HAVE BEEN DENIED BECAUSE IT IN EFFECT AMENDED THE INDICTMENT, OR WAS OTHERWISE IN SIGNIFICANT VARIANCE WITH THE INDICTMENT AND, BECAUSE THERE WAS NO EVIDENTIARY BASIS FOR THAT PART OF THE INSTRUCTION CONCERNING AN ACT DANGEROUS TO OTHERS?**

¶32. Catchings was indicted for ". . . wilfully, unlawfully, and feloniously, without authority of law, kill[ing] and murder[ing] Major Cassidy, a human being, with deliberate design to effect the death of Major Cassidy."

¶**33.** The following jury instruction, which was given over objection and which Catchings contends effectively amended the indictment, was given as S-1:

> The Court instructs the jury that murder is the killing of a human being, not in necessary self-defense, and without the authority of law, by any means or by any manner, when done with the premeditated and deliberate design to effect the death of the person killed or when done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual.

> The Court further instructs you that if you believe from the evidence in this case, beyond a reasonable doubt, that Vernon Ray Catchings on or about November 3, 1990, killed Major Cassidy, a human being, without authority of law, not acting in necessary self defense, AND

> (1) With the deliberate design to effect the death of Major Cassidy, OR

> (2) while engaged in the commission of an act eminently dangerous to others and evincing a depraved heart, disregarding the value of human life when the mortal or fatal blow was struck, whether or not he had any intention of actually killing Major Cassidy, then Vernon Ray Catchings is guilty of murder, and it is your sworn duty to so find.

¶34. Catchings argues that the instruction was improper because it constituted an amendment to the indictment and because it was not supported by the evidence. Miss. Code Ann. § 97-3-19 defines murder in the following manner:

> (1) The killing of a human being without the authority of law by any means or in any manner shall be murder in the following cases:

> (a) When done with deliberate design to effect the death of the person killed, or of any human being;

> (b) When done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual. . .

Miss. Code Ann. § 97-13-19 (1972).

¶35. Catchings argues that he was indicted under Miss. Code Ann. §97-3-19(1)(a), but that the jury was instructed under Miss. Code Ann. §§97-3-19(1)(a) and (b). Catchings argues that this "depraved heart" instruction effectively amended the indictment and cites *Quick v. State*, 569 So. 2d 1197 (Miss. 1990). In *Quick*, the court reiterated the holdings in a long line of cases and held that "the state can prosecute only on the indictment returned by the grand jury and . . . the court has no authority to modify or amend the indictment in any material respect." *Quick*, 569 So. 2d at 1199.

¶36. *Quick* was indicted under subsection (b) of the aggravated assault statute, which requires purposeful, wilful, and knowing actions on the part of the accused. *See* Miss. Code Ann. § 97-3-7 (2)(b) (1972). The

indictment was apparently amended, and *Quick* was convicted under subsection (a) of the aggravated assault statute, which requires recklessness and extreme indifference to the value of human life. *See* Miss. Code Ann. § 97-3-7 (2)(a) (1972).

¶37. The *Quick* court held that the jury instructions clearly contained a "new element which was not contained in the original indictment and . . . it was evidently this part of the instruction upon which the jury returned its verdict. Under these circumstances we have no alternative but to reverse and remand . . ." *Id.* at 569 So. 2d at 1200.

¶38. However, the case *sub judice* can be distinguished from *Quick*. With regard to the murder statute, subsections (a) and (b) have "coalesced." Indeed,

> [t]here is no question that the structure of the statute suggests two different kinds of murder: deliberate design/premeditated murder and depraved heart murder. The structure of the statute suggests these are mutually exclusive categories of murder. Experience belies the point. As a matter of common sense, every murder done with deliberate design to effect the death of another human being is by definition done in the commission of an act imminently dangerous to others and evincing a depraved heart, regardless of human life. Our cases have for all practical purposes coalesced the two so that Section 97-3-19(1)(b) subsumes (1)(a).

*Mallett v. State*, 606 So. 2d 1092, 1095 (Miss. 1992). *See also Hurns v. State*, 616 So. 2d 313, 321 (Miss. 1993). The judgment in this case was issued in February, 1993, well after this Court first interpreted the statute in this manner. Therefore, this argument is without merit.

¶39. Catchings' second contention regarding this instruction is that the depraved heart instruction was not supported by the evidence. He focuses on the idea that a depraved heart murder is typically an act such as shooting into a crowd, and that Catchings' actions in this case did not involve an act that was "dangerous to others." However, an "act which poses a risk to only one individual and which results in that individual's death may also be deemed depraved heart murder." *Windham v. State*, 602 So. 2d 798, 802 (Miss. 1992). "More pertinent to the facts of the case sub judice, death which resulted from injuries inflicted through use of an object . . . has been deemed to be within the scope of depraved-heart murder statutes." *Id.* at 802-3 (citing other cases where objects such as a "two-by-four piece of wood" and a "heavy wooden stick" were the objects which could validate the use of the depraved heart statutes). Therefore, Catchings' argument on this point is without merit.

## E. WHETHER THE TRIAL COURT SHOULD HAVE GRANTED INSTRUCTION D-17, DEFINING DELIBERATE DESIGN?

¶40. Proposed jury instruction D-17 was not given; it reads as follows:

> One of the elements of murder which the State must prove beyond a reasonable doubt is "deliberate design". "Deliberate" indicates full awareness of what one is doing, and generally implies careful and unhurried consideration of the consequences. "Design" means to calculate, plan, contemplate.

¶41. Catchings contends that, because instruction S-1 regarding deliberate design was given, then his proposed instruction D-17, which defines deliberate design, should have been given as well. This Court will not reverse for denial of an individual instruction when the jury has been instructed properly and fully by the granting of all the instructions. *Collins v. State*, 594 So. 2d 29, 35 (Miss. 1992). Here the elements of

murder were sufficiently addressed by the granting of other instructions. Therefore, this assignment of error is without merit.

## F. WHETHER THE TRIAL COURT SHOULD HAVE GRANTED INSTRUCTION D-7, THE "SINGLE JUROR" INSTRUCTION?

¶**42.** Proposed jury instruction D-7 was not given; it reads as follows:

The Court charges each juror that it is your sworn duty to vote on each and every ballot of the jury "Not Guilty", unless, after conferring with the other jurors and considering the evidence, your mind is convinced beyond a reasonable doubt of the guilt of the Defendant. You cannot, under your oath as a juror, compromise your honest beliefs or opinions from the evidence, or lack of evidence, as to the guilt or innocence of the Defendant for the purpose of bringing in a verdict. Under your oath and under the law, you should never surrender such beliefs or opinions simply because other members of the jury may disagree with you or insist that you yield to save the time of the Court or prevent a mistrial, or shorten the labors of the jury panel, or because of anything or reason whatsoever, or for any purpose whatsoever. You should vote "Not Guilty" as long as, after consideration of the evidence or lack of evidence in this case, the State has failed to prove Vernon Catchings' guilty beyond a reasonable doubt.

¶43. Catchings contends that the trial court committed reversible error by denying this "single juror" instruction. He argues that the "instruction was critical to Catchings in that it would have instructed the jury to, among other things, not change their 'honest convictions' for any reason." However, the record reflects that the jurors were instructed not to "surrender their honest convictions" in instruction C-5. Furthermore, the jurors were also instructed in Instruction D-5 that they had a duty not to change their vote "merely to agree with his or her fellow jurors."

¶44. "Regarding the standard for reviewing jury instructions, an instructional error will not warrant reversal if the jury was fully and fairly instructed by other instructions." *Collins v. State*, 594 So. 2d 29, 35 (Miss. 1992); *Heidel v. State*, 587 So. 2d 835, 842 (Miss. 1991). The jurors were amply instructed regarding this issue. Catchings' argument on this point, therefore, is without merit.

## G. WHETHER THE EVIDENCE SUPPORTED CATCHINGS' CONVICTION?

¶45. Catchings' final argument is that the verdict was contrary to the overwhelming weight of the evidence. The standard of review in these cases is whether the trial court abused its discretion in denying the appellant's motion for a new trial. *McClain v. State*, 625 So. 2d 774, 781 (Miss. 1993) (citing *Wetz,* 503 So. 2d at 807-808).

¶46. In this case, an eye-witness testified that Catchings hit Cassidy with the sawhorse while Cassidy's back was turned. Two witnesses testified that Cassidy had not done anything to provoke Catchings. Both doctors testified that it was unlikely that anything besides this blow caused Cassidy's subsequent death. Thus, the trial judge did not abuse his discretion by denying Catchings a new trial.

## IV. CONCLUSION

¶47. The issues raised by the appellant are without merit. Accordingly, the conviction of murder and sentence of life imprisonment is affirmed.

¶48. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.**

**PITTMAN, ROBERTS, SMITH AND MILLS, JJ., CONCUR. BANKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY LEE, C.J., SULLIVAN, P.J., AND McRAE, J.**

**BANKS, JUSTICE, DISSENTING:**

¶49. Because I believe that the trial court erred with regard to the deliberate design instructions, I dissent.

¶50. The majority maintains that the giving of the deliberate design instruction S-5 was "harmless error" based on its conclusion that the manslaughter instruction S-6 was not warranted. The conclusion that the manslaughter instruction was unwarranted appears to be based on the fact that Catchings's defense at trial was "self-defense." The majority then quotes and relies upon *Blanks v. State*, 542 So. 2d 222, 227 (Miss. 1989), asserting that, based on Catchings's trial defense strategy, "there is no reasonable factual scenario under which the jury may reasonably have concluded [under the deliberate design instruction], that [the appellant's] premeditated design to kill, if any existed in his mind but for an instant before the fatal act." *Id*.

¶51. In *Blanks* we noted that the defendant saw the victims damage the post on his house and "pursued them for several miles, pulled abreast of them and opened fire." *Blanks v. State*, 542 So. 2d at 227. Blanks pulled in front of the victims, "stopped his car, loaded his gun, and fired." *Id.* We said that "[u]nder any interpretation, enough time elapsed--close to fifteen minutes--that the law charged Blanks to cool his temper and act reasonably." *Id.*

¶52. In the instant case, the facts reveal that Catchings had a verbal confrontation with Cassidy inside the Short Stop restaurant. While leaving the Short Stop, Catchings saw Cassidy outside of a liquor store. Catchings asserts that he called out to Cassidy, saying "Hey, man, what's your problem." According to Catchings, Cassidy then waved a knife and cursed and threatened him. In response, Catchings immediately grabbed a saw horse and struck Cassidy in the head. It is apparent that the trial court felt that this evidence warranted the giving of a manslaughter instruction. I cannot agree with the majority that the trial court was in error.

¶53. The deliberate design instruction S-5 is in hopeless conflict with the manslaughter instruction S-6. As we held in *Windham v. State*, 520 So. 2d 123, 125 (Miss. 1987), "it is a contradiction in terms to state that a 'deliberate design' can be formed at the very moment of the fatal act. Moreover, it is possible for a deliberate design to exist and the slaying nevertheless be no greater than manslaughter."[(1)] This conflict may not be resolved, as the majority suggests, by declaring the manslaughter defense unavailable. On the facts of this case, the manslaughter instruction was properly given.

¶54. Furthermore, the majority asserts that the denial of proposed jury instruction D-17, defining deliberate design, was not error, based on the granting of other instructions which fully and properly instructed the jury. Majority opinion ante p. 16-17. In light of the necessity of S-6, I do not believe that the trial court's failure to grant instruction D-17, which would have aided the jury in considering instruction S-1, can be

excused. The denial of instruction D-17 was particularly improper because the trial court erroneously granted the State instruction S-5, further defining "deliberate design."

¶55. Because I believe that instructions S-5 and S-6 were in conflict, as in *Windham*, and that the trial court erred in denying proposed jury instruction D-17, I would reverse the judgment and remand this matter for a new trial.

**LEE, C.J., SULLIVAN, P.J., AND McRAE, J., JOIN THIS OPINION.**

1. Although I dissented in *Windham v. State*, 602 So. 2d 798, 808 (Miss. 1992) (*Windham II*), my opinion in that case has no bearing on my application of *Windham v. State*, 520 So. 2d 123 (1987) (*Windham I*) in the present case. I continue to adhere to my views as to the "depraved heart" provisions within our murder statute.