# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-01095-COA

OTIS SINGLETON                                                          APPELLANT

v.

STATE OF MISSISSIPPI                                                     APPELLEE

DATE OF JUDGMENT:                12/02/2024
TRIAL JUDGE:                     HON. ADRIENNE ANNETT HOOPER-
                                 WOOTEN
COURT FROM WHICH APPEALED:       HINDS COUNTY CIRCUIT COURT,
                                 FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:          OFFICE OF STATE PUBLIC DEFENDER
                                 BY: AMBER LAUREN STEWART
ATTORNEY FOR APPELLEE:           OFFICE OF THE ATTORNEY GENERAL
                                 BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY:               JODY EDWARD OWENS II
NATURE OF THE CASE:              CRIMINAL - FELONY
DISPOSITION:                     AFFIRMED - 04/14/2026
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., McCARTY AND EMFINGER, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1.     Otis Singleton was indicted by a Hinds County grand jury and charged with first-degree murder for the death of Victoria Hollingsworth. On July 31, 2024, a jury found Singleton guilty of the lesser-included offense of second-degree murder. Singleton was sentenced to a term of twenty years in the custody of the Mississippi Department of Corrections (MDOC), with five years suspended and fifteen years to serve. Singleton appealed.

## FACTS AND PROCEDURAL HISTORY

¶2.     On October 29, 2020, Singleton was at his residence, 739 Monterey Street in Hinds County, Mississippi. Earlier in the day, Singleton had been out trying to buy a tractor for his tree business. When he returned home, Victoria Hollingsworth and her friend "Ray"[1] stopped by to see Singleton. Hollingsworth told him that she had just gotten her truck back and needed vehicle parts—shocks, an alternator, and a two-inch ball hitch that was on his truck. Singleton stated that he placed his keys on top of the toolbox in the bed of his truck and helped Hollingsworth get the parts.

¶3.     After Hollingsworth and Ray left, Singleton needed to go to the store but could not locate the keys to his truck. After trying to find his keys for several hours, Singleton became suspicious that Hollingsworth and Ray may have stolen his keys. Singleton believed that Hollingsworth and Ray ran a "chop shop" and feared that they would return to his home with the keys and steal his truck.

¶4.     Singleton had a friend drive him to the store, and on the way, they ran into one of Hollingsworth's other friends. Singleton stopped and told this person to tell Hollingsworth to bring his keys back to his house. Hollingsworth returned to Singleton's house later that day and told him that she did not have his keys. She proceeded to help him look for the keys and even asked if he had them in his pocket. Singleton said they were not in his pocket and accused her friend Ray of taking them. Singleton forced Hollingsworth to call Ray while he listened in on the call. Ray also denied having the keys.

¶5.     In an effort to scare Hollingsworth, Singleton went to another room in the house and

---

[1] We do not have any record of Ray's last name.

2

retrieved an AR-15 assault rifle. Hollingsworth was sitting on the couch in the living room while on the phone talking to Ray. When Singleton came back into the living room, he placed the gun to Hollingsworth's head. The gun fired, and a single bullet traveled through Hollingsworth's head, killing her.

¶6.     Singleton then ran to the back room of the house and told his roommate, Nancy Warnock, that he had accidentally killed Hollingsworth. Warnock called 911. As the police arrived, Singleton admitted to killing Hollingsworth but maintained that the shooting was accidental. He was taken to the Jackson Police Department (JPD) to be interviewed, and an indictment for murder was filed on March 17, 2021.

¶7.     Singleton's trial began on July 29, 2024.  The State's first witness was Officer Sheron Wright, a detective for JPD. At the time of the shooting Wright was a patrol officer and the first officer at the scene. Officer Oaks and Officer Ollie arrived next, along with some additional officers. Wright testified that a white male, later identified as David Alexander, was standing at the door of the residence when Wright arrived on the scene and stated that a female had been shot and that the suspect was also inside.[2] Wright asked Alexander to stand outside with the other officers as they entered the residence.

¶8.     Upon entering the house, officers found Hollingsworth lying in a pool of blood and not breathing. Beside her body, the officers saw a black rifle sitting on the chair. Officer Edwards, another officer with JPD, cleared the rest of the house while Wright guarded the weapon and body. Edwards found Singleton and Nancy Warnock in the back bedroom. As

---

[2] Alexander was not called as a witness at trial.

Singleton was walking toward Wright, he had his hands in the air and openly stated that he "accidentally shot her." Singleton further explained that he had gone to his back room to get his rifle, and as he turned the corner, he accidentally shot her. According to Singleton, he was only trying to scare Hollingsworth into giving him his keys back. Wright placed Singleton in handcuffs, and Edwards walked him to her vehicle. Wright positively identified Singleton in court. On cross-examination, Wright affirmed that Singleton had told her that Hollingsworth and Ray were known for stealing cars. Wright did not recall anything unusual concerning the rifle found at the scene and testified that it was taken to the crime lab by Officer Andrew Harris.

¶9.     The State's next witness was Officer Edwards. He also testified that he encountered Alexander when he arrived at the scene and that Alexander told him someone had been shot inside. When Edwards entered the house, he "observed the white female with a gunshot wound to the head and a large amount of blood." He also recalled seeing an assault rifle nearby. Edwards testified that Singleton stated, "[T]he damn gun just went off." Edwards confirmed that before Wright transported Singleton to the police station, he searched Singleton's pockets. During this time, his body camera was on and recorded the search.

¶10.    Edward's body-cam footage was entered into evidence without objection. The footage was played for the jury. Edwards described the video showing that he retrieved one spent shell casing and one live round from Singleton's pants pocket. He then retrieved a pack of cigarettes, a watch, and a set of keys from the other pocket. Edwards positively identified Singleton in the courtroom.

4

¶11.    On cross-examination, Edwards was asked about the condition of the rifle found at the scene. Edwards did not recall anything unusual about the condition of the rifle and stated that he did not pick it up.  Edwards was questioned concerning the number of shots that had been fired. Edwards testified that he only knew of one shot that had been fired into Hollingsworth's head. Edwards also testified that Singleton voluntarily stated that "the damn gun just went off."

¶12.    Investigator Andrew Harris, the crime scene investigator, was the State's next witness. Through Harris' testimony, the State entered six photographs from the crime scene into evidence without objection. Harris described each of the photographs. The first photograph showed the number displayed on the house where Hollingsworth was shot and identified the house as 739 Monterey Street. The next photograph was of the rifle that was found in the living room of the home at 739 Monterey Street. Harris was then shown a box containing the rifle that he identified to be the same gun that was in the photographs from the crime scene. The rifle was admitted into evidence without objection. Another photograph was shown depicting the spent shell casing found at the scene. A brown envelope containing two shell casings, the one shown in the picture from the scene and the one taken from Singleton's pants pocket, was also entered into evidence without objection. The fourth photograph was described by Harris as the rug where Hollingsworth's body was found, in close proximity of the shell casing. The fifth photograph was of Hollingsworth's body lying on the ground prior to the coroner's arrival. Once the coroner arrived, Harris took a picture of the gunshot wound to Hollingsworth's head, which was the sixth photograph admitted into evidence.

¶13.     When collecting the rifle found at the scene, Harris testified that he cleared the weapon to make sure that it was not loaded and then swabbed the handle and the trigger to recover any DNA evidence. The cotton swab samples taken from the rifle were introduced into evidence with no objection. Harris took gunshot residue (GSR) samples from Singleton's hands and admitted it into evidence without objection.[3] The State then had Harris hold the rifle and open it to show that it was clear. He was asked to identify the magazine and the rounds that were found inside the magazine at the scene. Harris testified that the magazine contained thirteen live rounds of .223-caliber ammunition engraved with T-U-L, reflecting TulAmmo as the manufacturer. A matching fourteenth round was given to him by Edwards. The State then asked Investigator Harris to compare the rounds with the shell casing found beside Hollingsworth's body and the spent shell casing found in Singleton's pocket. The two casings matched the caliber and manufacturer of the fourteen live rounds.

¶14.     On cross-examination, Harris was questioned about the condition of the rifle when he found it. He could not recall if he put a zip tie on the weapon but stated that it is usually done so that the weapon cannot accidentally discharge. During redirect, the State asked Harris about the zip ties that were depicted in the photograph of the rifle at the scene. The photograph showed white zip ties on the rifle. The State then had Harris count the number of zip ties that were currently on the rifle and noted that the zip ties were black.

¶15.     The State called Detective Martha Dee. Dee was the first detective to arrive at the

---

[3] DNA and GSR samples were collected and admitted into evidence at trial; however, later testimony revealed that the samples were not sent to be tested because Singleton admitted to firing the weapon.

scene. She stated that "when [she] arrived, [she] noticed there was a white female lying on the floor in a pool of blood." Dee testified to making contact with Warnock, Alexander, and Singleton. She testified that both Alexander and Singleton were taken in for interviews. Dee stated that she and Officer McNeal conducted the interviews. A document containing her signature was identified as the *Miranda*[4] warning form that she administered to Singleton. The document was then entered into evidence with no objection. A condensed version of Singleton's recorded interview was admitted into evidence without objection and was played for the jury. During the interview, Singleton stated that the rifle was held together with a zip tie and that his finger was not even on the trigger. Dee testified that according to Singleton, he wanted to "add some pressure to get his keys back," and "he would do whatever he had to do to get her to come up off his keys." When Dee asked him about how the keys were found, Singleton would not admit to finding them. He stated he saw them on the patrol car. During cross-examination, Dee affirmed Singleton indicated that the rifle had a zip tie keeping it together and that the weapon had accidentally gone off. She also admitted that Singleton stayed at the house until the police arrived and cooperated from the beginning to the end.

¶16.    The State's next witness was Dr. Mark LeVaughn, an associate medical examiner who was accepted as an expert in the field of forensic and anatomic pathology. LeVaughn testified concerning the autopsy of Hollingsworth. LeVaughn described the "contact" entry wound to the right side of Hollingsworth's head. A contact entry wound was defined by Dr.

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

LeVaughn as

> the weapon not exactly touching but close and out to approximately three feet, you have a puncture wound as the bullet. But on the skin if there's no clothing or anything to block it, you will see the soot and little tiny abrasions due to the gunpowder and that's called tattooing or stippling. . . . So, this is a very classic example of a contact wound to the head.

LeVaughn testified the muzzle of the rifle was "poking against" Hollingsworth's right temple at the time it was fired. The bullet traveled through the skull creating multiple fractures, through the brain causing massive injury, and exited her neck on the left side just below her ear lobe. The bullet then reentered her left shoulder and lodged in the muscle where it was recovered during the autopsy. The State introduced into evidence the projectile LeVaughn removed. LeVaughn testified it was his opinion that Hollingsworth's cause of death was a "contact gunshot wound to the head" and that the manner of death was homicide.

¶17.     Forensic scientist Tommy Bishop was the last witness called by the State. After being accepted by the court as an expert in the field of firearms and ballistics, he was questioned about the tests he conducted on the firearm used in this case. He first identified the projectile recovered from Hollingsworth's body as having .223-caliber class characteristics, six lands, and grooves with a right twist. The second test was to determine whether the projectile recovered from the body was shot from the rifle that was recovered from the scene.  He was able to testify that the projectiles bore the same class characteristics, but he could not say more because the projectile recovered from the body was too damaged.

¶18.     Additionally, Bishop was asked to do a function test of the weapon itself. Bishop stated that the request made was to see if he could make the firearm discharge without the

trigger being pulled. Bishop tested the weapon by hitting the rifle with a rawhide mallet. He tested the weapon both with the magazine in the weapon and without the magazine in the weapon. These tests were also conducted with the safety being engaged and not engaged. During his testing, the weapon never discharged. The only way that Bishop was able to make the rifle discharge was by pulling the trigger. Furthermore, Bishop testified that it took between four-and-a-half to six-and-a-half pounds of pressure to pull the trigger.

¶19.    Bishop also testified as to the condition of the weapon when he received it. He stated that the upper and lower receivers were held together by a white zip tie. He removed the zip tie to place a loose buffer spring back inside the weapon and then replaced the white zip tie with a black one. When asked about the gun being able to fire without the buffer spring in place or with a loose zip tie holding the receivers together, Bishop stated that distance between the upper and lower receivers would not cause a misfire; it would keep the gun from firing at all. In his professional opinion, the rifle never malfunctioned.

¶20.    Following Bishop's testimony, the State rested. The defense moved for a directed verdict, which was denied.  Singleton elected not to testify, and the defense rested, calling no witnesses. The defense then renewed the motion for a directed verdict, which was denied.

¶21.    Following an overnight recess, the jury was given twenty-two jury instructions, heard closing arguments by each side, and retired to deliberate. The jury returned a verdict finding Singleton guilty of second-degree murder. On August 8, 2024, Singleton filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial. Singleton's motion was denied, and he appealed.

## ANALYSIS

**I.      Did the trial court err in giving Jury Instruction 21 because it was an incomplete statement of the law, and was Singleton prejudiced by the trial court giving the instruction?**

¶22.    This issue raised by Singleton is the result of a failure to recognize how our law defining murder has evolved through deliberate design and depraved heart murder to first-degree and second-degree murder. We recently described this process in *Harris v. State*, 409 So. 3d 1176, 1177 (¶3) (Miss. Ct. App. 2024):

> At the time of Harris's conviction, deliberate design murder and depraved heart murder had "coalesced" (prior to degrees of murder being created by the Mississippi Legislature). [footnote omitted] *See White v. State*, 964 So. 2d 1181, 1187 (¶14) (Miss. Ct. App. 2007) (stating that "Mississippi case law has established that deliberate design murder and depraved heart murder have coalesced into one" (citing *Chatman v. State*, 952 So. 2d 945, 948 (¶6) (Miss. Ct. App. 2006) ("[D]epraved heart murder involves an act so reckless that malice or deliberate design is implied."))); *see also Catchings v. State*, 684 So. 2d 591, 599 (Miss. 1996) (acknowledging that "[o]ur cases have for all practical purposes coalesced" deliberate design and depraved heart murder (citing *Mallett v. State*, 606 So. 2d 1092, 1095 (Miss. 1992))).

Further, footnote two of the *Harris* opinion, noted above stated:

> This state did not adopt the concept of first- and second-degree murder until 2013. The statute was modified that year to reflect the following pertinent additions:
>
>> (1) The killing of a human being without the authority of law by any means or in any manner shall be murder in the following cases:
>>
>>> (a) When done with deliberate design to effect the death of the person killed, or of any human being, shall be first-degree murder;
>>>
>>> (b) When done in the commission of an act eminently dangerous to others and evincing a depraved heart,

> regardless of human life, although without any premeditated design to effect the death of any particular individual, shall be second-degree murder. . . .

2013 Miss. Laws ch. 555, § 1 (S.B. 2377) (emphasis added); Miss. Code Ann. § 97-3-19 (Supp. 2013).

*Harris*, 409 So. 3d at 1177 n.2.

¶23.    At trial, Singleton's counsel tendered Instruction D-9, which read:

> The Court instructs the jury that depraved heart murder and culpable negligence differ "simply by degree of mental state of culpability. In short, depraved-heart murder involves a higher degree of recklessness *from which malice or deliberate design may be implied*.

(Emphasis added).  During the jury instruction conference, the State objected to the portion of the instruction that states "from which malice or deliberate designed may be implied." The State based its objection on the clear fact that neither second-degree murder nor culpable negligence manslaughter require proof of malice or deliberate design. The defense responded that it got the instruction from *Windham v. State*, 602 So. 2d 798, 801 (Miss. 1992), which was decided before the Legislature clearly separated deliberate design murder and depraved heart murder into first- and second-degree murder in 2013.[5] However, Singleton's counsel voluntarily agreed to amend his proposed instruction to omit that language. The instruction was amended and given to the jury as Instruction 21.

¶24.    On appeal, although Singleton's new counsel admitted that his trial counsel agreed to the instruction given to the jury, he asks this Court to find plain error. He contends that Singleton was prejudiced by the exclusion of the language because it would have helped the

---

[5] All of the cases cited by Singleton in his brief on appeal in favor of this language were decided before 2013.

jury distinguish between the degree of recklessness required to find Singleton guilty of second-degree murder as opposed to culpable negligence manslaughter.

¶25.    Concerning a plain error analysis, the supreme court stated in *Spiers v. State*, 361 So. 3d 643, 657 (¶41) (Miss. 2023):

> "Plain-error review is properly utilized for correcting obvious instances of injustice or misapplied law." *Ambrose v. State*, 254 So. 3d 77, 111 (Miss. 2018) (quoting *Armstead v. State*, 196 So. 3d 913, 916 (Miss. 2016)). The plain error doctrine applies when there has been an error that resulted in a manifest miscarriage of justice or seriously affects the fairness, integrity or public reputation of judicial proceedings. *Ambrose*, 254 So. 3d at 136 (quoting *Conners v. State*, 92 So. 3d 676, 682 (Miss. 2012)). "To determine if plain error has occurred, this Court must determine 'if the trial court has deviated from a legal rule, whether that error is plain, clear[,] or obvious, and whether that error has prejudiced the outcome of the trial.'" *Conner v. State*, 138 So. 3d 143, 151 (Miss. 2014) (alteration in original) (internal quotation marks omitted) (quoting *Grayer v. State*, 120 So. 3d 964, 969 (Miss. 2013)).

When reviewing a challenge to a jury instruction on appeal, the supreme court explained in *Victory v. State*, 83 So. 3d 370, 373 (¶12) (Miss. 2012):

> [T]o grant or deny proposed jury instructions is within the sole discretion of the circuit court. *Newell v. State*, 49 So. 3d 66, 73 (¶20) (Miss. 2010). Thus, this Court reviews the grant or denial of jury instructions for an abuse of discretion. *Id.* No one instruction should be singled out. *Id.* Accordingly, the Court reviews the jury instructions as a whole to determine whether an error has occurred. *Id.* "A defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Id.* at 74 (¶ 20) (quoting *Hearn v. State*, 3 So. 3d 722, 738 (¶45) (Miss. 2008)). "[I]f the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." *Id.* at 73 (¶20) (quoting *Rubenstein v. State*, 941 So. 2d 735, 785 (¶224) (Miss. 2006)).

¶26.    In the present case, the jury was instructed as to the essential elements of first-degree murder, as charged in the indictment, second-degree murder, and culpable negligence

manslaughter. The jury was instructed as to the definition of "deliberate design" as used in the first-degree murder instruction.[6] The jury was instructed as to the definition of acting with a depraved heart. The jury was also instructed as to the definition of culpable negligence. Further, by instruction 21, the jury was told that depraved heart murder involves a higher degree of recklessness than does culpable negligence manslaughter. Having been properly instructed as to the essential elements of each crime, in the language of each statute, any additional comparative instructions were not necessary. *See McCool v. State*, 328 So. 3d 173, 190-91 (¶¶83-84) (Miss. Ct. App. 2021).

¶27. We find that the trial court committed no error, plain or otherwise, and that this issue is without merit.

## II. Was the jury's verdict contrary to the weight of the evidence?

¶28. Singleton also argues that the jury's verdict was against the overwhelming weight of the evidence. Singleton contends that the overwhelming weight of the evidence "supports a finding of manslaughter rather than second-degree murder." He asks that this Court remand the case for re-sentencing for culpable negligence manslaughter. In support of this argument, he cites testimony that he contends requires a culpable-negligence-manslaughter verdict:

> Singleton only grabbed the gun as a means to scare Hollingsworth, and further
> stated that the gun was being held together by zip ties. This indicated that the
> gun did not work properly. He stated multiple times that in the midst of talking
> to Hollingsworth, the gun went off with a "bam." He also said that he did not
> even have his finger on the trigger.

¶29. Singleton's recitation of facts does not view the evidence as we are required to do on

---

[6] We find that the language omitted from proposed instruction D-9 could have created confusion with the first-degree murder instruction.

13

appeal. In *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017), the Mississippi Supreme Court clarified our standard of review for the denial of motions for a new trial:

> [N]either this Court nor the Court of Appeals assumes the role of juror on appeal. We do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury. Our role as appellate court is to view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.

Thus, we review the trial court's denial of Singleton's motion for a new trial for abuse of discretion.

¶30.　There is no dispute that Singleton retrieved his rifle from another room in the midst of an argument with Hollingsworth. He then fired a bullet into the side of Hollingsworth's head, according to Dr. LeVaughn's testimony, with the muzzle of the rifle "poking against" her right temple, killing her. In Singleton's recorded interview, he admitted that he was the one who shot Hollingsworth. He also stated, "Sometimes you have to put the fear of God in people." The jury also heard Singleton's claim to the detectives that the shooting was accidental and that "BAM! The damn gun just went off." However, according to the State's expert, during his tests, he could not make the weapon accidentally discharge. Instead, he testified that in his expert opinion, in order for the gun to fire, the trigger needed to be pulled with four-and-a-half to six-and-a-half pounds of pressure.

¶31.　As stated above, it was for the jury to determine the credibility of the witnesses and resolve any conflicts in the evidence. Further, the jurors can draw such reasonable inferences from the evidence as they deem appropriate based upon their own experience and common

sense. *See Jones v. State*, 252 So. 3d 574, 587 (¶54) (Miss. 2018). After being instructed upon the elements of second-degree murder and culpable negligence manslaughter, the jury obviously found that Singleton acted with a higher degree of recklessness and returned a unanimous verdict finding him guilty of second-degree murder. We find that the trial court did not abuse its discretion in denying Singleton's motion for a new trial and that to allow this verdict to stand would not "sanction an unconscionable injustice."

## CONCLUSION

¶32. After reviewing the record, we find no error by the trial court. Therefore, Singleton's conviction and sentence for second-degree murder are affirmed.

¶33. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., McDONALD, LAWRENCE, McCARTY, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**